IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

ERIC NAVICKAS and JAY LININGER,                    Case No. 1:10-cv-03004-CL

Plaintiffs,

REPORT & RECOMMENDATION

v.

SCOTT CONROY, Forest Supervisor of the Rogue
River-Siskiyou National Forest, and UNITED
STATES FOREST SERVICE, a federal agency,

Defendants.

_____

CLARKE, Magistrate Judge.

Pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, plaintiffs

challenge the Ashland Forest Resiliency Project, a hazardous fuel reduction project in the

Siskiyou Mountains Ranger District of the Rogue River-Siskiyou National Forest. Plaintiffs

name as defendants the United States Forest Service and Scott Conroy, in his official capacity as

Forest Supervisor for the Rogue River-Siskiyou National Forest (collectively, "the Forest

Service"). Plaintiffs raise claims under the National Forest Management Act, 16 U.S.C. § 1600,

*et seq.*; the Healthy Forests Restoration Act, 16 U.S.C. § 6501, *et seq.*; and the National

Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* Before the court are plaintiffs' motion for

summary judgment (#42) and motion to strike (#64), and defendants' cross motion for summary

judgment (#53). For the reasons stated below, plaintiffs' motion for summary judgment should be granted in part and in denied in part; plaintiffs' motion to strike should be granted in part and denied in part; and defendants' cross motion for summary judgment should be granted in part and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Congress provided for the creation of national forests through the Creative Act of 1891, which gave the President authority to "set apart and reserve ... public lands wholly or in part covered with timber or undergrowth ... as public reservations." Charles F. Wilkinson & H. Michael Anderson, *Land and Resource Planning in the National Forests*, 64 OR. L. REV. 1, 17-18 (1985) (*quoting* Act of Mar. 3, 1891, ch. 561, 26 Stat. 1095, 1103, *repealed by* 90 Stat. 2792 (1976)). The Department of Agriculture has been charged with the administration of the National Forest System ("NFS") since 1905. *See* Act of Feb. 1, 1905, ch. 288, 33 Stat. 628. Today, the NFS consists of over 191 million acres of land, including 155 national forests, 51 purchase units, 20 national grasslands, 20 research and experimental areas, 8 land utilization, and 33 "other areas," which are managed by the United States Forest Service ("Forest Service"), an agency of the Department of Agriculture. Wyoming v. U.S. Dept. of Agric., 661 F.3d 1209, 1221 (10th Cir. 2011) (*citing* 36 C.F.R. § 200.1).

The Rogue River-Siskiyou National Forest ("the Forest") covers almost 1.8 million acres of land in southwestern Oregon and northern California, ranging from the crest of the Cascade Mountains in the west into the Siskiyou Mountains, nearly to the Pacific Ocean. The Forest is divided into five Forest Service Ranger Districts, including the Siskiyou Mountains Ranger District. The Forest, which contains over 340,000 acres of federally protected wilderness areas, is part of the Klamath-Siskiyou bioregion, a proposed world heritage site renowned for its

extraordinarily rich biodiversity. (A.R. 4029).[1] The Forest provides habitat for the northern

spotted owl, listed as threatened under the Endangered Species Act, as well as several species

identified as "sensitive" by the United States Forest Service ("Forest Service"), including the

Pacific fisher, the Pacific pallid bat, and the Pacific fringe-tailed bat. (A.R. 5592, 5594, 5596).

Prior to the arrival of European settlers, low intensity wildfires occurred cyclically and

played a major role in shaping the ecology of the Forest. (A.R. 26, 2092-2093, 2385, 4029,

4844-4845). However, following a particularly devastating series of forest fires in 1910, the

Forest Service implemented a national fire suppression policy aimed at excluding fires in the

National Forest System. (A.R. 4029). Over time, this alteration of the historic fire cycles

resulted in a shift in vegetation from fire-adapted species to a more dense composition of fire

intolerant species. (A.R. 26, 2095-2096, 5079, 5092, 7214). This increase in forest-stand

density and change in species composition raises concerns that the nation's forests have become

vulnerable to widespread outbreaks of disease and infestation, drought stress, and large scale,

high intensity, stand-replacing fires. (A.R. 2386-2395, 4844-4845, 5080, 7216). It is believed

that these conditions were largely responsible for the widespread forest fires that occurred during

the summer of 2002. At issue in this case are the 8,150 acres of the Forest designated for

hazardous fuels reductions treatment under the Ashland Forest Resiliency Project ("AFR

Project"). (A.R. 7006).

## I.   The Ashland Municipal Watershed Cooperative Agreement

The AFR Project proposes to treat an area of the Forest that includes portions of the

15,785 acre Ashland Creek sub-watershed, which encompasses "all of the hydrologic area

associated with the Ashland Municipal Watershed." (A.R. 6856, 7006, 7811). The city of

Ashland has a water right for most of the water in Ashland Creek, which serves as the primary

---

[1] Citations to the Administrative Record are designated as "A.R."

source of the city's municipal water supply. (A.R. 1299). The waters of Ashland Creek are impounded by the Reeder Reservoir. (A.R. 2148). In 1929, the city of Ashland and the Secretary of the Department of Agriculture signed a Cooperative Agreement which provides that the Forest Service shall manage the Ashland Watershed in such a way as to safeguard Ashland's municipal water supply. (A.R. 0001-0003). The respective roles and responsibilities of the Forest Service and the city of Ashland have been further developed and refined through iterative Memoranda of Understanding signed in 1986 (A.R. 0116-0119), 1996 (A.R. 2334-2337), and 1999 (A.R. 2603). The Ashland Watershed was initially managed according to an Interim Watershed Management Plan drafted in 1979, which was replaced in 1990 by the Rogue River National Forest Land Resource Management Plan. (A.R. 6885).

## II.  The Rogue River National Forest Land Resource Management Plan

The AFR Project proposes to treat an area of the Forest that lies within what was historically the Rogue River National Forest, (A.R. 1293), which was administratively combined with the Siskiyou National Forest in 2004 to form the Rogue River-Siskiyou National Forest.[2] The Land Resource Management Plan for the Rogue River National Forest ("the Rogue River LRMP"), which is the relevant LRMP for the purpose of this case, was issued in 1990 pursuant to the NFMA and its implementing regulations. (A.R. 1285, 1292). The Rogue River LRMP establishes a long-range strategy designed to treat eight issues: timber harvest levels, recreational opportunities, domestic water supply watersheds, wildlife habitat, riparian-fish habitat, use of unroaded areas, spotted owl, and old-growth timber. (A.R. 1798). It describes the desired Forest condition through twenty-one interrelated and sometimes overlapping goal statements which "form the principal basis" for developing the management objectives. (A.R. 1314-1335).

---

[2] *See* http://www.fs.usda.gov/detail/rogue-siskiyou/home?cid=stelprdb5305069

The Rogue River LRMP divides the 632,000 acre Rogue River National Forest into twenty-four designated Management Areas ("MAs"), each of which has a correlating Management Strategy ("MS").[3] (A.R. 1292, 1343-46). The Rogue River LRMP outlines two categories of Standards and Guidelines to be applied to the management of the Forest: 1) forest-wide Standards and Guidelines, which apply to all MAs unless specifically excepted, and 2) the MS or "prescription" that correlates to a particular MA and prescribes the substantive rules designed to achieve the unique management goals specific to that MA. (A.R. 1292-1293, 1343-1344). However, some MAs encompass acreage suitable for more multiple MSs. (A.R. 1344). Therefore the Rogue River LRMP establishes "priority rankings" which are set out in descending order from most restrictive to least restrictive, as follows: MA 13 – Wilderness; MA 10 – Wild River; MA 25 – Research Natural Area; MA 12 – Botanical Area; MA 5 – Special Interest Area; MA 4 – Developed Recreation; MA 3 – Backcountry Non-motorized; MA 22 – Restricted Watershed; MA 19 – Spotted Owl Habitat; MA 15 – Old Growth; MA 26 – Restricted Riparian; MA 11 – Scenic River; MA 6 – Foreground Retention; MA 7 – Foreground Partial Retention; MA 8 – Middle Ground Retention; MA 16 – Mature Habitat; MA 9 – Middleground Partial Retention; MA 14 – Big Game Winter Range; MA 23 – Managed Watershed; MA 21 – Timber Suitable 2; MA 20 – Timber Suitable 1; MA 17 – Primary Range; MA 18 – Secondary Range; and MA 1 – Minimum Management. (Id.).

## III. The Northwest Forest Plan

The Rogue River LRMP was amended in April of 1994 by the "Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl," commonly known as the Northwest Forest Plan ("NW

---

[3] The FEIS for the Rogue River LRMP suggested that twenty-four MAs be established, however, two of those MAs (MA-2, Backcountry Motorized and MA-24, Managed Riparian) were not selected for implementation. (A.R. 1346).

Forest Plan"). (A.R. 1835-2070). The NW Forest Plan, jointly signed by the Secretaries of the United States Department of Agriculture and the United States Department of the Interior, amends the LRMPs for all national forests within the range of the Northern Spotted Owl, including the Rogue River LRMP. (A.R. 1853, 7843). The NW Forest Plan applies to more than 24 million acres of federal land, consisting of six specifically designated land allocation categories (Congressionally Reserved Areas, Late Successional Reserves, Adaptive Management Areas, Managed Late Successional Areas, Administratively Withdrawn Areas, and Riparian Reserves) and the matrix (federal lands outside the six designated land allocation categories). (A.R. 1843, 1847-1848).

The NW Forest Plan replaces only those standards and guidelines under existing LRMPs which conflict with the NW Forest Plan standards and guidelines. (A.R. 1853). It sets forth standards and guidelines common to all land allocations, (A.R. 1969-1973), as well as standards and guidelines specific to the six designated land allocation categories and matrix, (A.R. 1975-2015). Because the six land allocation categories and matrix overlap, sometimes significantly, the NW Forest Plan identifies a hierarchy among the standards and guidelines specific to each land allocation category. (A.R. 1968). The standards and guidelines in existing LRMPs, including the Rogue River LRMP, apply where they are more restrictive or provide greater benefits to late-successional forest related species, subject to certain specific exceptions. (A.R. 1849, 1853, 1968-1970).

## IV. The 1995 Bear Watershed Analysis

In 1995, the Ashland Ranger District, then one of four Ranger Districts for the Rogue River National Forest, issued the Bear Watershed Analysis ("1995 Bear Watershed Analysis"). (A.R. 2073-2176). The Bear Watershed is comprised of ten sub-basins, including Ashland Creek

and the West and East Forks of Ashland Creek. (A.R. 2087). The Bear Watershed boundary overlaps, but does not coincide with, the Mt. Ashland Late-Successional Reserve boundary. (A.R. 2082).

Weak geologic materials such as decomposed granitic rock types compose nearly 96% of the Bear Watershed Analysis Area ("Bear WAA"). (A.R. 2112). The 1995 Bear Watershed Analysis found that landslide potential in areas of weak geologic materials is extreme when slopes are over 70%, high when slopes are 51-70%, moderately weak when slopes are 30-50%, and low when slopes are less than 30%. (Id.). These landslide potential values "should only be used in areas that have not been mapped on a landslide hazard zonation ("LHZ") map. (Id.). According to the 1995 Bear Watershed Analysis, sediments dislodged in LHZ 1, the highest risk ground, "contain an increased likelihood for material to be transported to Reeder Reservoir." (Id.). A number of human activities were identified as potentially affecting soil stability, including road construction, timber harvesting, the construction of the Reeder Reservoir, the construction of the Mt. Ashland Ski Area, prescribed burning, and the tree granite quarries located in the Bear WAA. (A.R. 2114-2118). Of these, the tradeoff in localized soil and slope instability resulting from the use of prescribed fire in the Ashland RNA and near the city of Ashland was noted to be an "acceptable tradeoff" due to the correlating effect of reducing the likelihood of large scale stand replacing fires. (A.R. 2117).

Reeder Reservoir, which impounds Ashland's municipal water supply, lies within the Ashland Creek watershed. (A.R. 2164). The 1995 Bear Watershed Analysis found flood and wildfire to be major disturbance mechanisms of concern to Ashland's municipal water supply, as both would likely result in soil damage, erosion, and mass wasting, with resulting mass sedimentation deposits in Reeder Reservoir. (Id.). Sediment deposit rates in the Reeder

Reservoir were estimated at approximately 0.16 cubic yards per acre per year. (A.R. 2116-2117). Using satellite data, the percent of vegetative cover for the Ashland Creek and West and East Forks of the Ashland Creek sub-basins was determined to range from a low of 94.4% to a high of 95.8%, therefore current vegetative conditions likely had a minimal effect on the timing, character, and distribution of water flow in these sub-basins. (A.R. 2119). The 1995 Bear Watershed Analysis concluded that these vegetative conditions represented a deviation from historic conditions resulting from fire exclusion, with the resulting increased potential for high intensity wildfire and resulting increased sediment production. (Id.).

## V. The Mt. Ashland Late-Successional Reserve Assessment

In 1996, the Forest Service issued the Late-Successional Reserve Assessment for the Mt. Ashland Late-Successional Reserve (#RO-248) ("Mt. Ashland LSR Assessment"), (A.R. 2338-2532), for the purpose of determining whether the Mt. Ashland LSR was functioning according to NW Forest Plan standards and guidelines. (A.R. 2352). The LSR Network in the Pacific Northwest is shaped roughly like the letter "H," with the California and Oregon Coastal Ranges in the west connected by the Siskiyou Crest to the Cascade and Sierra Ranges in the east. (A.R. 2358-2359). The Mt. Ashland Late-Successional Reserve (#RO-248) ("Mt. Ashland LSR") straddles the Siskiyou Crest, encompassing 51,512 acres where the Siskiyou Crest connects with the Cascades and Sierras. (A.R. 2359). Its location makes the Mt. Ashland LSR a "critical hingepoint or node for the southwest Oregon network." (Id.).

The Mt. Ashland LSR Assessment disclosed that mid-successional habitat, a dominant feature of the Mt. Ashland LSR, provided functional habitat for many late-successional and old-growth dependent species such as the northern spotted owl, particularly the larger diameter mid-successional stands where the trees range from 17 to 24 inches diameter at breast height

("DBH"). (A.R. 2346, 2370). Maintenance and preservation of late-successional and dispersal habitat in the Mt. Ashland LSR were thus deemed important to the recovery of the northern spotted owl. Furthermore, because the Mt. Ashland LSR links the high elevation Siskiyou range with the southern Oregon Cascades, it "functions as the critical node for the overall migratory patterns and genetic dispersal in the Pacific Northwest." (A.R. 2347). The fire dependent ecosystems of the Mt. Ashland LSR were found to be "overstocked" as the result of fire exclusion, a condition which, compounded by a nine year drought, was noted as having caused heavy mortality rates among large Douglas-fir trees, a "general decline in the ponderosa and sugar pine component of stands, especially in the larger tree size class," and the rapidly disappearing "hardwood component of stands historically maintained by frequent fire episodes." (A.R. 2349, 2356-2357).

The Mt. Ashland LSR Assessment concluded that these conditions rendered the Mt. Ashland LSR potentially vulnerable to large scale stand replacing fire which, should it occur, would result in late-successional habitat loss and greatly compromise the connectivity of the LSR Network. (A.R. 2349, 2356). Furthermore, a large scale stand replacing fire would threaten the domestic water supply for the city of Ashland, as the Ashland Creek Municipal Watershed is situated within the northern portion of the Mt. Ashland LSR. (A.R. 2349, 2356). Accordingly, the Mt. Ashland LSR Assessment developed five implementation strategies: late-successional habitat maintenance, protection – fire suppression, late-successional habitat enhancement, restoration, and an implementation strategy specific to the Ashland RNA. (A.R. 2398). Pursuant to the NW Forest Plan, the management objectives and standards in place for the Mt. Ashland RNA take precedence over the Mt. Ashland LSR Assessment implementation strategies. (A.R. 2399).

The Mt. Ashland LSR Assessment proposes to maintain, enhance, and restore late successional habitat by implementing fire hazard reduction treatments in strategic areas that would protect the habitat as a whole from large scale stand replacing fires and accelerate the development of late-successional habitat characteristics. (A.R. 2398-2399). Consistent with the NW Forest Plan standards and guidelines for LSRs, thinning in stands greater than 80 years of age for the sole purpose of accelerating LSR characteristics is prohibited. (A.R. 2421). However, it was recommended that stands greater than 80 years consisting of trees with 10 to 18 DBH be considered for density management treatments because they do not provide late-successional stand characteristics. (Id.).

In Appendix D, the Mt. Ashland LSR Assessment prepared separate Fire Management Plans ("FMPs") for the North and South Zones of the LSR. (A.R. 2461-2511). The North Zone FMP addresses the Ashland Ranger District of the Rogue River National Forest. (A.R. 2462-2488). Using photographs from the 1850s and 1860s as a reference, the North Zone FMP determined that organized fire suppression had over time caused the historically relatively open stands of shade intolerant and fire resistant species such as ponderosa pine and Douglas-fir to become heavily stocked with shade tolerant species, resulting in heavier fuel loads as the result of competition and moisture stress caused the stands to self-thin. (A.R. 2466-2468).

The North Zone FMP recommended a five-part approach to fire management, involving vegetation management, pre-suppression, snags and fire fighter safety, suppression, and fire prevention. (A.R. 2475-2480). Under vegetation management, the North Zone FMP proposed a combination of treatments including density management, prescribed fire, and manual manipulation of live and dead vegetation, noting that the reintroduction of fire alone would not restore the Douglas-fir and ponderosa pine forests to historic old growth conditions due to the

build-up of ladder fuels, and that springtime prescribed burning did not significantly alter or modify vegetation within riparian zones due primarily to moisture conditions. (A.R. 2475, 2477). In a discussion of the benefits and disadvantages of various treatments, the North Zone FMP noted that landscape level prescribed burning had "the greatest chance over the long run to improve forest health and reduce the severity or size of high severity wildfires," however, it would require additional funding and personnel, changes in the social/political infrastructure, and multiple applications and subsequent maintenance. (A.R. 2485). It would also be in conflict with the density management strategy, which faced the additional challenge of economic viability. (A.R. 2486). Ultimately, strategic planning to achieve management objectives while improving forest health and reducing fire hazard would likely require the application of a combination of strategies based on a number of variables. (Id.).

## VI. The Ashland Forest Resiliency Project

The history of the Ashland Forest Resiliency Project ("AFR Project") reaches back to 1996 and the Ashland Interface Fire Hazard Reduction Project ("HazRed Project"), a fire hazard reduction plan under which the Ashland Ranger District proposed to construct and expand a ridgeline shaded fuelbreak system through the treatment of 1,631 acres in the interior of the Ashland Watershed. (A.R. 3595, 4028). The HazRed Project generated substantial controversy, widespread resistance, and six appeals. (A.R. 4027-4042).[4] In 1998, the Forest Ranger reversed the HazRed Project's Decision Notice and ordered a Draft Environmental Impact Statement ("DEIS") to further develop the environmental analysis, after which the HazRed Project was renamed the Ashland Watershed Protection Project ("AWPP"). (A.R. 2968, 3595, 4034).

---

[4] Timothy Ingalsbee, *From Analysis Paralysis to Agency-Community Collaboration in Fuels Reduction for Fire Restoration: A Success Story, in* FIRE, FUEL TREATMENTS, AND ECOLOGICAL RESTORATION: CONFERENCE PROCEEDINGS, 225 (U.S. Dep't of Agriculture et al. eds., 2003), *available at* http://www.fs.fed.us/rm/pubs/rmrs_p029.pdf.

The Forest Ranger proactively engaged the community in a dialogue regarding the

AWPP, leading to the formation of the Ashland Watershed Stewardship Alliance ("the

Stewardship Alliance"), a community group which submitted a 95-page proposal (A.R. 2646-

2771) on the last day for comment on the DEIS. (A.R. 4035-4036). The Forest Service

responded to these and other community concerns in the January 2001 Final Environmental

Impact Statement ("FEIS") (A.R. 2945-3513) by proposing Alternative Six as its preferred

course of action, a phased schedule of fuel treatments on some 1,550 acres over a period of 8-12

years, beginning with fuel treatments in the wildland-urban interface ("WUI") before extending

treatments to the existing fuelbreaks in the interior of the watershed. (A.R. 4038). In May of

2001, the Forest Service issued its Record of Decision (A.R. 3591-3703) adopting a modified

version of the FEIS's Alternative 6 which, among other things, deferred the removal and sale of

large trees for several years, imposed diameter limits on the trees to be commercially thinned

within the WUI zone, and deferred the proposed road and helicopter landing construction. (A.R.

3596-3599).

## A. The 2003 Upper Bear Assessment

In December of 2003, the Ashland Ranger District published the 2003 Upper Bear

Assessment ("2003 UBA"), (A.R. 4218-4463), described as "an analytical effort to validate and

supplement the environmental condition information for the ecosystem and landscape associated

with the Ashland Watershed" to the conditions existing in 2003, (A.R. 4222). The 2003 UBA

was intended in part to "jump start" project planning for fire hazard reduction treatments on the

13,500 or so acres of the Ashland Watershed which were not treated under the 2001 AWPP.

(A.R. 4220-4221). Its 41,133 acre analysis area, (A.R. 4254), included 22,286 acres of national

forest encompassing thirteen of the Rogue River LRMP's twenty-four MAs and three of the NW

Forest Plan's seven land allocation categories, (A.R. 4237-4238). The Standards and Guidelines for the NW Forest Plan land allocation categories overlay and merge with the Management Strategies for the Rogue River LRMP Management Areas. (Id.).[5] Included in the 2003 UBA analysis area are the Ashland RNA (A.R. 4240-4243), the McDonald Peak Inventoried Roadless Area (A.R. 4244-4246), and 21,343 acres designated as Late-Successional Reserves under the NW Forest Plan, (A.R. 4237). Although not conducted under the NEPA process, the 2003 UBA was conducted for the purpose of providing background information and the foundation for "forthcoming NEPA planning on future proposed actions" through a five component analysis. (A.R. 4222). Four of these components are relevant here.

Component One of the 2003 UBA updated and generally validated the 1995 Bear Watershed Assessment and 1996 Mt. Ashland LSR Assessment, albeit for a smaller analysis area consisting of all lands within the Ashland Creek Watershed and portions of three other sub-watersheds. (A.R. 4233-4295). Using "more technically precise computer mapping methods," Component One calculated the Ashland RNA as occupying 1,306 acres within the Ashland Municipal Watershed. (A.R. 4235, 4241).[6] Component One incorporated a number of decisional documents conducted under the NEPA process for other projects on National Forest System Lands, including the AWPP Decision Notice and AWPP FEIS. (A.R. 4247, 4249).

Component Two analyzed the past, present and desired forest vegetation conditions in order to establish the range of "natural" ecosystems in the analysis area and facilitate compliance with the desired natural or near natural conditions described by the NW Forest Plan's standards and guidelines for LSRs and the Rogue River LRMP's standards and guidelines for Restricted

---

[5] Table 1-1 and Map 1-1 on pages 1-6 and 1-7, respectively, of the 2003 UBA (A.R. 4238-4239) are helpful in understanding the relationship between the NW Forest Plan Standards and Guidelines and the Rogue River LRMP Management Strategies.
[6] When established, the Ashland RNA was calculated as occupying 1,408 acres. (A.R. 12, 4241).

Watersheds, MS-22. (A.R. 4297-4343). Vegetation conditions were organized on a scale of Plant Association Groups ("PAGs")[7] and further described according to five stand structure types, based on the seral stage and degree of overstory tree canopy closure. (A.R. 4305). Past or "natural" vegetation conditions were defined as those existing prior to 1850. (A.R. 4301). The analysis determined that current conditions varied significantly from past conditions, resulting in a risk of stand replacing fire ranging from "extreme" to "high" in 33,874 acres of the analysis area. (A.R. 4303, 4326, 4328-4332).[8]

Component Three, a Fire Management Assessment, assimilated conditions regarding fire and fuels and analyzes fire hazard and risk for the purpose of providing a foundation for the development and finalization of a Fire Management Plan ("FMP") for the federally managed portion of the 2003 UBA analysis area. (A.R. 4350). In order to achieve desired conditions and the management goals of the Rogue River LRMP and NW Forest Plan, Component Three proposed the construction of a shaded fuel break system and creation of defensible fuel profile zones ("DFPZs") and a complimentary "compartmentalization" strategy, under which each PAG would be treated with a combination of prescribed burning, density management, and vegetation modification. (A.R. 4384-4387).

Drawing on Components One through Four, Component Five of the 2003 UBA extracted a number of "Key Issues and Findings." (A.R. 4419-4421). Component Five proposed to achieve the desired "natural" range of variability by applying treatments that modify fire behavior by (1) facilitating effective fire suppression and (2) reducing the potential of fire and/or

---

[7] See Table 2-1 Plant Association Groups and Relationship to Plant Associations. (A.R. 4303).
[8] The risk of stand replacing fire was determined to be the highest for PAG 1408 – Moist Douglas-fir; "extreme" for PAG 1103 – Oregon White Oak and PAG 1002 – Ponderosa Pine; "very high" for PAG 1407 – Dry Douglas-fir and PAG 2004 – Dry White Fir; and "high" for PAG 2003 – Moist White Fir, and "low" or "low to moderate" for the remaining three PAGs. (A.R. 4328-4332). See Table 2-1 (A.R. 4303) for acreage per PAG.

subsequent effects, primarily through variable density management and the application of controlled or prescribed fire ("underburning"). (A.R. 4435). Component Fire did not recommend fire exclusion, but deemed the use of landscape scale or wildland fire to be inappropriate in light of the current vegetation conditions and recommended that fire be used only in the future "when stand conditions are closer to those described in the desired conditions." (A.R. 4436). Component Five recommended the "compartmentalizing" strategy be applied by dividing the Analysis Area into twelve compartments allocated to one three categories (interface, late-successional habitat, and species diversity), and that Defensible Fuel Profile Zones ("DFPZs") be created in each compartment, (A.R. 4436-4440).

The 2003 UBA recommended a ten year implementation strategy, with the creation of DFPZs and compartmentalization as the first priority, variable density management treatments to protect the Ashland Municipal Watershed as the second priority, measures to protect LSR habitat as a third priority, and the protection and maintenance of the Ashland RNA as the fourth priority. (A.R. 4452-4455). The 2003 UBA further recommended that the application of the second, third and fourth priorities be delayed until the DFPZs had been created, as the other treatment priorities would likely not be effective absent DFPZs. (A.R. 4457).

## B. The 2004 Scoping Letter

In February of 2004, the Forest Service initiated the scoping process for the AFR Project by publishing a Notice of Intent to prepare an Environmental Impact Statement ("EIS") in the Federal Register (A.R. 4686-4689), sending government-to-government consultation letters (A.R. 4658-4660), and distributing a public scoping letter (A.R. 4662-4669). (See A.R. 7840-7841 (summarizing public involvement in the AFR Project decision process)). As described therein, the AFR project proposed to protect the Ashland Municipal Watershed and LSR habitat

from the threat of wildland fire by returning the ecological processes in the treatment area to more "natural" range of variability. (A.R. 4665). The scoping letter proposed the AFR Project would accomplish this goal by treating 8,150 acres[9] of National Forest based on the compartmentalization strategy outlined in the 2003 UBA. (A.R. 4665-4666).

Both plaintiff Eric Navickas ("Navickas") and Jay Lininger ("Lininger") submitted comments to the Forest Service responding to the public scoping letter. (A.R. 4872-4944). In response to the scoping letter, the City of Ashland Forest Lands Commission, in conjunction with local conservation groups, individual citizens, and city staff, developed the Ashland Community Wildfire Protection Plan ("the CWPP"), which was approved by the Ashland City Council on September 21, 2004, and transmitted to the Forest Service on October 1, 2004. (A.R. 5078-5255).

## C. The 2004 Klamath Mountains Ecoregional Assessment

In April 2004, the Nature Conservancy published the Klamath Mountains Ecoregional Assessment, in which it observed that "it is quite evident that forest management threats, such as fire suppression and incompatible forestry, are the primary challenges for many sites identified for the ecoregion." (A.R. 4844). The Nature Conservancy continued: "The highest ranked threat to biodiversity in the ecoregion is 'fire suppression,' which can be thought of as various forms of incompatible fire-related management. ... Incompatible forms of fire-related management is among the most significant threats to biodiversity across the Klamath Mountains

---

[9] 2,800 acres would be treated to create DFPZs, 3,200 acres in six compartments outside the Ashland Municipal Watershed would be treated to protect or reduce the chance of a fire entering the watershed, 600 acres within the Ashland Municipal Watershed would be treated to break up contiguous fuels, and 1,300 acres of the Ashland RNA would be treated to both reduce hazardous fuels and advance the conservation of large Ponderosa pine and pine species the RNA was established to protect by selectively removing competition to large trees and/or creating conditions to encourage regeneration. (A.R. 4666-4668).

ecoregion." (Id.). However, "[t]he scope of threat from incompatible forms of timber harvest is one of the greatest in the Klamath Mountains ecoregion." (A.R. 4845).

### D. The 2005 Draft Environmental Impact Statement

In June of 2005, the Forest Service issued a Draft Environmental Impact Statement ("DEIS") for the AFR project. (A.R. 5355-5854). The DEIS described the AFR Project as responding to the "need" to protect the water supply and late-successional and old-growth forest ecosystems of the analysis area, and the project's "purpose" as protecting values at risk, reducing hazardous fuels, reducing the potential for crown fire, and achieving conditions more resilient to wildland fires. (A.R. 5359, 5380). The DEIS identifies "values at risk" as including "human life and property associated with the wildland/urban interface; ecological sustainability including protection and maintenance of pine; water quality including protection of the municipal water supply, and protection of threatened species and maintenance of late-successional habitat." (A.R. 5378). The DEIS analyzed three alternatives: a no-action alternative, the Forest Service's Proposed Alternative, based on the 2003 UBA, and, as required by the HFRA, the CWPP, termed the "Community Alternative" for purposes of the DEIS. (See A.R. 5360, 5399). A Notice of Availability for the AFR Project's DEIS was published in the Federal Register on June 24, 2005. (A.R. 5972-5973). Both Navickas (A.R. 6285-6297) and Lininger (Supp. A.R.[10] 3488-3516, 3517-3545; A.R. 6298-6450) submitted comments to the Forest Service responding to the DEIS. In December of 2005, the Forest Service NEPA planning team met with the Technical Team primarily responsible for planning and drafting the CWPP, to discuss and evaluate the possible blending DEIS's Proposed Alternative and Community Alternative. (A.R. 7582).

---

[10] "Supp. A.R." indicates citation to the Supplemental Administrative Record. See Dckt # 34 (index) and attachments 34-1 through 34-59 (supplemental materials).

## E. The 2008 Final Environmental Impact Statement

In September of 2008, after considering public comments on the DEIS, the Forest Service issued a Final Environmental Impact Statement ("FEIS") for the AFR Project. (A.R. 6854-7579). A Notice of Availability for the AFR Project's FEIS was published in the Federal Register on September 19, 2008. (A.R. 7690). The FEIS identified the same "purpose" and "need" as are described in the DEIS. (A.R. 6856, 6877). The FEIS analyzed four alternatives: a no-action alternative, the Forest Service's proposed alternative, the community alternative (the CWPP), and the Forest Service's preferred alternative, developed as the result of the efforts to blend the proposed alternative and community alternative. (A.R. 6857, 6895). The maximum number of acres to be treated varies by alternative: up to 8,150 acres of National Forest would be treated under the Proposed Action, (A.R. 6928); up to 8,990 acres would receive treatment under the Community Alternative, (A.R. 6941); and up to 7,600 acres would receive treatment under the Preferred Alternative, (A.R. 6959). The Mayor and City Council for the city of Ashland formally endorsed[11] the Preferred Alternative on October 27, 2008. (A.R. 7760). Both Lininger (A.R. 7706-7753) and Navickas (A.R. 7754-7759) submitted comments responding to the FEIS.

## F. The 2009 Record of Decision

On October 8, 2009, the Forest Service issued a Record of Decision ("ROD) selecting and authorizing the Preferred Alternative, without modification, for the AFR Project. (A.R. 7807-7847). Under the selected Preferred Alternative, approximately 7,600 acres of National Forest are scheduled for treatment, (A.R. 7095), including 1,045 acres within the McDonald Peak IRA, (A.R. 7002, 7113), and 1,290 acres within the Ashland RNA, (A.R. 7002, 4235,

---

[11] The Nature Conservancy and James K. Agee, Emeritus Professor of Forest Ecology at the University of Washington, commended the Preferred Alternative to the city of Ashland's City Council. (A.R. 7691-7694).

4241). All 7,600 acres lie within the Mt. Ashland LSR. (A.R. 7095). The treatment area

encompasses 606 acres within Landslide Hazard Zone ("LHZ") 1, 960 acres within LHZ 2, and

985 acres of Riparian Reserves. (A.R. 7001).

The project area is organized into four "Strategic Categories" (3,210 acres of strategic

ridgeline treatments; 2,780 acres of fuel discontinuity treatments; 1,280 acres of Research

Natural Area treatments; and 330 acres of roadside treatments), with fuel discontinuity treatment

areas forming the foundation for the distribution of treatment areas. (A.R. 7816-7818; Table

ROD-1 at A.R. 7824). Two landscape-level fuel management objectives are identified: the

ability to contain fires within specified areas (compartmentalization), and fire behavior

modification through area-wide treatments designed to reduce severity. (A.R. 7818). The ROD

relies on the 2003 UBA to satisfy the HFRA's requirement of a determination of significant risk

of adverse effects in the event of wildland fire. (A.R. 7814). The ROD includes a 17-page

appendix with project design elements and mitigation measures to guide on-the-ground

implementation. (A.R. 7848-7864). The controversy in this case centers around the proposed

treatments within the Ashland Research Natural Area, the McDonald Peak Inventoried Roadless

Area, and certain late-successional habitat areas.

### 1. The Ashland Research Natural Area

The Ashland Research Natural Area ("Ashland RNA") was established by the Forest

Service Chief[12] on May 4, 1970, to provide examples of the "Pacific" ponderosa pine and

---

[12] The general provisions of the Organic Administration Act of 1897 (16 U.S.C. § 551) authorize
the Secretary of Agriculture to designate Research Natural Areas. Under regulations at 7 CFR §
2.60(a), the Secretary has delegated this authority to the Forest Service Chief, who, pursuant to
36 CFR § 251.23, selects and establishes Research Natural Areas as part of the continuing land
and resource management planning process for National Forest System lands.

ponderosa pine-Douglas-fir. (AR 12, 23). All 1,306 acres[13] of the Ashland RNA are located in Jackson County, occupying the slopes of a steep, rugged mountain canyon along the East Fork of Ashland Creek, which is part of the Ashland municipal watershed. (A.R. 12, 16, 23). At the time that it was established, the Ashland RNA was classified as commercial forest land. (A.R. 16). However, very little logging had been done because the application of standard logging methods to this area posed a significant risk of damage to the watershed, as the majority of the tract consists of steep to very steep topography covered by relatively shallow, highly erodible decomposed granitic soils. (A.R. 16). Thus, the Ashland RNA area consisted almost entirely of old-growth ponderosa pine, Douglas fir, and "very old" sugar pine. (A.R. 13-14).

The area designated as the Ashland RNA was specifically selected to fill a "serious gap in natural area coverage and provide an adequate research site for studies" in forests west of the Cascade Range in southern Oregon. (Id.). The Ashland RNA was established for the purpose of providing:

"an undisturbed example of Pacific ponderosa pine—Douglas fir for (1) scientific and educational study of ecological processes, successional trends, and environmental relationships of these types; (2) a control site for comparison with others influenced by man; e.g., evaluation of pollution problems and effects of management on water yield and quality; and (3) a gene pool and preserve for plant and animal species within the tract."

---

[13] The record contains multiple inconsistent descriptions of the number of acres encompassed by the Ashland RNA. The 1970 establishment report states that the Ashland RNA encompasses 1,408 acres, (A.R. 12), as does the FEIS for the AFR Project, (7140). The FEIS for the Rogue River LRMP states that the Ashland RNA encompasses 1,640 acres. (A.R. 272). The Forest Service mapped the Ashland RNA during the 2003 UBA using "more technically precise computer mapping methods," and calculated that it contains 1,306 acres. (A.R. 4235, 4241). The difference in acreage is the result of calculation methodology, not changes to the boundaries of the Ashland RNA. (Id.). Because the 2003 UBA appears to have used the most precise technology, is the most recent mapping effort, and is expressly incorporated by reference by the AFR Project's FEIS, (A.R. 6884), for the purposes of this opinion, the court assumes that the Ashland RNA encompasses 1,306 acres. Although the AFR Project's FEIS repeatedly describes the Ashland RNA as encompassing 1,408 acres, the court must conclude that this is the result of error or oversight on the part of the Forest Service.

(A.R. 12). Accordingly, at the time it was established, the management objective of the Ashland RNA was stated as being "to maintain natural conditions within the tract for scientific and educational study." (A.R. 16). The 2003 UBA mapped the Ashland RNA as containing approximately 40% PAG 1407 – Dry Douglas Fir, 37% PAG 1408 – Moist Douglas Fir, 15% PAG 2004 – Dry White Fir, and 7% PAG 2003 – Moist White Fir, with minor amounts of non-forested area. (A.R. 4444).

Management of the Ashland RNA is governed by the objectives set out in the Rogue River LRMP's Management Strategy 25 – Research Natural Area, and the NW Forest Plan's Standards and Guidelines for the administratively withdrawn land allocation category. (A.R. 6880-6881; *see also* A.R. 4237-4238, 4447). Under the FEIS's Preferred Alternative, adopted by the ROD, the overall treatment strategy for the Ashland RNA is the selective removal of "competition to existing large ponderosa or sugar pine and Douglas-fir to create conditions that would encourage regeneration of the pine species." (A.R. 6963, 7820). "Thinning would retain those trees best suited to withstand the more open conditions that would result from thinning." (A.R. 6964, 7821). "Variable density management, prescribed burning and other surface fuel reduction treatments are options that would encourage more natural species diversity and a more fire resilient forest." (A.R. 6963, 7820). Of the 1,280 acres of the Ashland RNA scheduled to receive treatment under the ROD, the Preferred Alternative proposes to treat 780 acres with variable density management treatments. (Id.). Treatments within the Ashland RNA shall be coordinated with the Pacific Northwest Research Station. (A.R. 7821). The Forest's Research Natural Area Coordinator expressed concern with the extent of the treatments proposed by the AFR Project. (A.R. 6189-6191). The ROD responds to these concerns by mitigating the variable density treatments, providing that "[a]pproximately 20% of the area scheduled for

variable-density management will be left untreated." (A.R. 7864). Accordingly, only 624 acres within the Ashland RNA will be treated with variable density treatments.

## 2. The McDonald Peak Inventoried Roadless Area

The McDonald Peak Inventoried Roadless Area ("IRA"), which is adjacent to the Ashland RNA, is comprised of 9,425 acres located on the divide between Ashland Creek, Little Applegate River, and Wagner Creek. (A.R. 836, 839, 4244-4245, 7113).[14] A portion of the McDonald Peak IRA lies within the Ashland Creek watershed and contributes runoff to Reeder Reservoir which, as described above, impounds the municipal water supply for the city of Ashland. (A.R. 838, 7830). As part of the Record of Decision for the Rogue River LRMP, the McDonald Peak IRA was allocated to six Management Areas ("MAs"): MA4 – Developed Recreation (the Mt. Ashland Ski Area); MA5 – Special Interest Area; MA12 – Botanical Area; MA22 – Restricted Watershed (for Ashland's municipal water needs); MA23 – Managed Watershed (allowing timber harvest under a Managed Watershed strategy associated with the Talent Watershed); and MS26 – Restricted Riparian. (A.R. 835-841, 4244).[15] The AFR Project proposes hazardous fuel reduction treatments on 1,045 acres of the McDonald Peak IRA. (A.R. 7830).

The AFR Project's ROD states that treatments within the McDonald Peak IRA "will generally focus on thinning and removal of small-diameter material." (A.R. 7816). However, the ROD specifically rejects the "diameter limit" constraint suggested in the CWPP (and analyzed as the Community Alternative in the DEIS and FEIS), and instead provides that

---

[14] For a visual depiction of the McDonald Peak IRA, see Map 1-3 on page 1-14 of the 2003 UBA (A.R. 4246).

[15] For a list of the Management Areas and correlating Management Strategies established by the Rogue River LRMP, see A.R. 1346.

"treatments will be applied to meet the desired condition with no 'diameter limit' constraint."
(A.R. 7819).

### 3. Late-Successional Habitat Areas

All 7,600 acres scheduled for treatment under the AFR Project lie within the Mt. Ashland
LSR. (A.R. 7095; *see also* maps at A.R. 4239, 7096, 7817). Both the Mt. Ashland LSR and
Critical Habitat Unit ("CHU") OR-76, designated by the U.S. Fish and Wildlife Service
("USFWS") for the recovery of the northern spotted owl, are late-successional habitat areas.
(A.R. 7095).[16] There is significant overlap between the Mt. Ashland LSR and CHU OR-76,[17]
however, they are not coextensive. (A.R. 7096-7097).

### SUBJECT MATTER JURISDICTION

Defendants argue in part that this court lacks subject matter jurisdiction over this action
because neither plaintiff has suffered an injury-in-fact, therefore neither plaintiff has standing to
bring this action. (Defs' Mot. Supp. Cross-Mot. Summ. J., Dckt. # 54, pp. 12).

In order to demonstrate Article III standing, an environmental plaintiff must demonstrate:
(1) an injury-in-fact that is both actual or imminent, and concrete and particularized, in that it
affects the plaintiff in a personal and individual way; (2) a causal connection between that injury
and the conduct being challenged; and (3) that it is likely that the injury will be redressed by a
decision favorable to the plaintiff. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.
("Laidlaw"), 528 U.S. 167, 180-81, 120 S.Ct. 693 (2000) (*citing* Lujan v. Defenders of Wildlife,
504 U.S. 555, 560–61, 112 S.Ct. 2130 (1992)). "In environmental cases, the requisite injury for
standing purposes is not necessarily injury to the environment, but injury to the plaintiff." White
Tanks Concerned Citizens, Inc. v. Strock, 563 F.3d 1033, 1038 (9th Cir. 2009) (*citing* Laidlaw,

---

[16] In 2008, the USFWS issued its Spotted Owl Recovery Plan designating the area encompassed
by CHU OR-76 as Mapped Owl Conservation Area ("MOCA") 19. (A.R. 7095).

[17] For a visual depiction, see MAP III-5 at A.R. 7096.

528 U.S. at 182). To satisfy the injury element of standing on the basis of an aesthetic or recreational interest, a plaintiff must show that (1) the plaintiff has made repeated visits to the area affected by the challenged project, (2) the plaintiff has concrete plans to visit the area again, and (3) the plaintiff's recreational or aesthetic interests will be harmed if the challenged project is allowed to go forward. *See* Wilderness Soc'y, Inc. v. Rey, 622 F.3d 1251, 1256 (9th Cir. 2010) (*citing* Summers v. Earth Island Inst., 555 U.S. 488, 494, 129 S.Ct. 1142 (2009)).

Plaintiffs allege they have aesthetic, recreational, and scientific interests in the Siskiyou Mountains Ranger District of the Rogue River-Siskiyou National Forest, including the AFR Project area, which will be impaired if the treatments proposed under the AFR Project are completed. (Compl. ¶¶ 11,12). The Forest Service does not dispute that injury to plaintiffs' aesthetic and recreational interests is a sufficient basis for standing. Rather, the Forest Service argues that neither Lininger nor Navickas has demonstrated past use of any particular portion of the 7,600 acre AFR Project area, including the Ashland RNA, or any concrete plans to visit any part of the AFR Project in the future, therefore neither of them has adequately alleged a specific injury to their asserted interests. The Forest Service does not otherwise challenge plaintiffs' standing.

## I.   Lininger Has Standing

The Forest Service argues that Lininger's affidavits in support of standing are insufficient because they fail to demonstrate that he has used any portion of the project area prior to 2010, or that he uses and will continue to use any particular portion of the Forest affected by the AFR Project. The Forest Service further argues that to the extent that Lininger alleges ongoing regular use and intended future use of the project area, those allegations are not credible due to the fact that Lininger lives in New Mexico. These arguments lack merit.

Lininger's affidavits in support of standing (#43, 59, 68) demonstrate extensive use of the Rogue River-Siskiyou National Forest, including the AFR Project area. Although he currently resides in Albuquerque, New Mexico, Lininger was born in Ashland, Oregon, graduated from Ashland High School, lived in Ashland as recently as 2007, considers Ashland and the surrounding areas to be his home, and returns frequently to visit family. Lininger's affidavits describe a pattern of use of the Forest in general starting in childhood and, starting in early adulthood, specific use of the project area as his interests expanded from purely recreational to scientific and academic. He describes his involvement in the Ashland Watershed Stewardship Alliance, formed in 1998, and his participation on the technical team appointed by the Mayor of the city of Ashland to assist with developing the community alternative presented to the Forest Service in connection with the proposed for the Ashland Watershed Protection Project.[18] He further describes his service on the Ashland Forest Resiliency Community Alternative Team, which provided the technical recommendations for the Community Wildfire Protection Plan ("CWPP") developed and approved by the city of Ashland in response to the AFR Project scoping letter, and presented to and incorporated by the Forest Service. As a part of this team, Lininger repeatedly visited the AFR Project area over a six month period in 2004 to inventory and map forest conditions and discussed and developed technical recommendations for the CWPP.[19] The data Lininger gathered during this period also informed his graduate work at the University of Montana.

Lininger has submitted additional evidence of use of specific portions of the AFR Project area in 2008 and 2009. (*See* Decl. Dennis Odion Supp. Pls' Standing, Dckt. # 67, ¶¶ 3-4; Decl.

---

[18] The Ashland Watershed Stewardship Alliance and Ashland Watershed Protection Project are described above in Section VI of the Factual and Procedural Background.

[19] These allegations are substantiated by the document submitted as Exhibit A (Dckt. # 62-1) to the defendants' reply in support of their motion for summary judgment, which is addressed in the section of this opinion discussing plaintiffs' motion to strike, below.

Carol Voisin, Dckt. # 69, ¶ 3). In addition to general statements of past use of the entire AFR

Project area, Lininger's affidavits describe in detail a number of visits to the Ashland RNA and

other AFR Project areas from August through December of 2010 demonstrating that he has used

significant portions of the AFR Project treatment area as recently as 2010, including the Ashland

RNA.[20] His affidavits further and express his intention to return to the AFR Project area in

March of 2011,[21] and describe in some detail his plans to continue to visit various portions of the

AFR Project treatment area in the imminent future. Lininger further alleges that his aesthetic and

recreational interests will be harmed if the treatments proposed under the AFR Project are

allowed to go forward.

     In sum, Lininger has submitted evidence demonstrating he has repeatedly used the Forest

in general, and the project area specifically, for recreational, educational, and scientific purposes,

and makes credible allegations of desired future use. The court therefore finds that Lininger has

Article III standing to challenge the AFR Project.

//

---

[20] The legal description for the area considered for treatment under the AFR Project is Township 39 South, Range 1 East, sections 17, 19, 20, 21, 25, 27, 28, 29, 30, 31, 32, 33, 34, and 35; Township 40 South, Range 1 East, sections 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15,and 17; Township 39 South, Range 1 West, Sections 24, 25, 26, 34, 35 and 36; and Township 40 South, Range 1 West, sections 1 and 2, Jackson County. (A.R. 6856, 7811). Lininger's affidavits in support of standing demonstrate specific use of Township 39 South, Range 1 East, sections 19, 20, 21, 27, 28, 29, 30, 31, 32, 33, and 34; and Township 40 South, Range 1 East, sections 1, 2, 3, 4, 5, 6, 7, and 10. (Second Decl. Jay Lininger Supp. Standing, Dckt. # 59, ¶¶ 2-7; Third Decl. Lininger Supp. Standing, Dckt. # 68, ¶ 1). The Ashland RNA includes acreage in Township 39 South, Range 1 East, sections 21, 27, 28, 33, and 34, and Township 40 South, Range 1 East, sections 3, 4, 9, and 10. (A.R. 0012).

[21] Plaintiffs filed their motion for summary judgment (#42) on November 24, 2010. Plaintiffs' motion and defendants' cross motion were argued and submitted to the court on May 6, 2011. Thus, Lininger's intent to return in March of 2011 is sufficient to indicate his intent to return in the immediate future as of the time of plaintiffs' motion. The fact that this court's Report and Recommendation has been delayed more than a year, this is due in part to the extraordinary volume of the record in this case and in part to other demands on the court's resources, and does not affect the sufficiency of Lininger's affidavits in support of standing.

## II. Navickas Has Standing

The affidavits in support of standing filed by Navickas (#44, 60) demonstrate that at the time of plaintiffs' motion, he was serving on the Ashland City Council with a term expiring in December of 2010, and that he maintains a residence in the city of Ashland. Navickas alleges he has used and enjoyed the lands in the AFR Project area in the past for hiking, running, biking, skiing, fishing, and photography, and intends to continue to do so. His residence is described as being in "close proximity to the project area." It is "not unusual" for him to hike "into the areas under consideration" either directly from his home or by driving to a trailhead or access point. In particular, Navickas describes regularly visiting the Ashland RNA, hiking alone or with other citizens, either through the lower edge near Lamb's Saddle or by "dropping down" from Winburn Ridge. He alleges he "regularly" leads hikes within the Ashland RNA, and expresses his intention to "regularly visit and use the RNA within the Ashland Watershed." Navickas asserts the AFR Project will harm his aesthetic and recreational interests by degrading the late-successional forest and aquatic habitats in which he maintains aesthetic and recreational interests.

These allegations are sufficient to establish that Navickas has an aesthetic and recreational interest, particularly with respect to the Ashland RNA. "Where the recreational use of a particular area has been extensive and in close proximity to the plaintiff, we have held that an affiant's expressed intention to continue using the land is sufficiently concrete to underwrite an injury-in-fact." Wilderness Soc'y, Inc. v. Rey, 622 F.3d 1251, 1256 (9th Cir. 2010) (*citing* White Tanks Concerned Citizens, Inc., 563 F.3d at 1039). The Forest Service argues these allegations are insufficient to confer standing under Summers and Wilderness Society because they are not sufficiently specific with respect to what portions of the project area Navickas has

used, when he used them, and when he intends to revisit them. (Reply Mem. Supp. Defs' Cross-Mot. Summ. J., Dckt. # 62, pp. 3-4). The court is not persuaded.

Navickas' allegations demonstrate a longstanding and relatively specific pattern of use of the project area coupled with a credible allegation that he will continue this pattern of use in the future. His allegations demonstrate such close geographical proximity to the project area that he is able to hike from his doorstep into the Forest. He describes "regularly" visiting the area on his own and with groups, and describes specific points of entry into the Ashland RNA in particular. The court declines to require that Navickas include a date-certain statement of when he intends to visit the area in order to make credible his allegations of past, continued, and future use. This omission appears to be mere oversight attributable to the fact that Navickas uses the area on a constant, ongoing basis. This case is therefore distinguishable from Summers and Wilderness Society.

In Summers, the Supreme Court held that the plaintiffs lacked standing to challenge the validity of a Forest Service regulation exempting salvage timber sales of 250 acres or less from the requirement under NEPA to prepare an EIS or EA, where the regulation applied nationwide and there was no specific timber sale at issue, only the possibility that a timber sale could be approved under the regulation sometime in the future in some as yet unknown forest. 555 U.S. at 1147-1150. In Wilderness Society, the Ninth Circuit similarly held that organizational plaintiff lacked standing where it relied on the affidavit of a single member who had authored a hiking book about the forest at issue thirty years ago, offered no testimony as to when he might return but only a general intent to return to several national forests in two states in the future, and did not assert a personal interest in the area of the forest affected by the specific project at issue, only that the organizational plaintiff had an interest. 622 F.3d at 1256-1257.

In a recent Ninth Circuit case, the Forest Service challenged an environmental organization's standing to challenge the amendment of eleven forest plans governing eleven national forests in the Sierra Nevada Mountains, relying on Summers and Wilderness Society. Pac. Rivers Council v. U.S. Forest Serv., --- F.3d ---, 2012 WL 2333558 (9th Cir. 2012). The court began by reviewing Summers and Wilderness Society and concluding that the facts of those cases were "substantially different" from the case before it. Id. at *8. The plaintiff organization in Pacific Rivers Council relied on the affidavit of an individual member alleging that he personally and the organization's members generally had used and would continue to use the national forests in the Sierra Nevada in a variety of places and in a variety of ways. Id.. Noting that the Forest Service challenged the plaintiff organization's standing for the first time on appeal, the Ninth Circuit observed that the court would ordinarily remand the case to the district court to allow the organization to submit "declarations of individual members who use and enjoy the Sierras, specifying particular national forests and particular patterns of use," but declined to do so, concluding that "such additional development is unnecessary." Id. The forest plan amendment at issue would allow harvesting of billions of board feet of timber in all eleven national forests, with effects that would be "visible from great distances" and in areas where recreational forest users "spend much of their time." Id. at *9. The court therefore concluded that the plaintiff organization had Article III standing. Id. at *10.

In this case, Navickas challenges a project that proposes to treat 7,600 acres of a national forest which is within walking distance of his home. The treatments proposed are extensive. They are proposed to occur on hillsides, along streams and rivers, and in particular will occur on all but 26 acres of the Ashland RNA. Navickas is an active, engaged, and well-known local environmental activist. He was present at the May 6, 2011, oral argument on the parties' cross-

motions for summary judgment and has been an active participant throughout the litigation. His affidavits describe a longstanding pattern of use of the Forest, and, in particular, the Ashland RNA. The court finds his allegations of past use, present use, and intended future use to be credible.

Under these circumstances, the court finds that Navickas' allegations in support of standing are sufficiently specific to demonstrate a specific injury to his asserted interests. The court therefore finds that Navickas has Article III standing to challenge the AFR Project.

### Conclusion

Because the court finds that both plaintiffs have standing to bring this action, the court proceeds to consider the merits of the parties' motions.

## PLAINTIFFS'MOTION TO STRIKE

Plaintiffs move to strike Exhibit B (Dckt. # 54-2) attached to defendants' cross motion for summary judgment and Exhibit A (Dckt. # 62-1) attached to defendants' reply memorandum in support of defendants' cross-motion for summary judgment (Dckt. # 62), on grounds that these exhibits are irrelevant and inadmissible character evidence pursuant to Federal Rules of Evidence 404 and 609.

### I.   Local Rule 7-1(a)(1)

Defendants first argue the court should reject plaintiffs' motion to strike for failure to comply with Local Rule 7-1(a)(1), which requires the moving party to certify that counsel has made a good faith effort to resolve the dispute through personal or telephone conferences. The decision whether to strike a motion for failure to comply with Local Rule 7-1(a)(1) is committed to the discretion of the district courts. *See* Smith v. U.S. Bank, N.A., Civ. No. 10-3077-CL, 2011 WL 7628515, * 9 (Oct. 26, 2011) ("Plaintiffs' motion fails to comply with the certification

requirements under Local Rule 7.1, and may be denied for that reason alone.") (*citing* L.R. 7-1(a)(2) ("The Court *may* deny any motion that fails to meet this certification requirement.")). The court finds no reason to exercise its discretion and therefore declines to reject plaintiffs' motion to strike. Plaintiffs' are cautioned to consult with the local rules and to ensure compliance going forward.

## II. Exhibit B

As Exhibit B to their cross-motion for summary judgment, defendants offer the July 2002 unpublished opinion issued by Judge Hogan in the case of Klamath-Siskiyou Wildlands Center v. Forest Service, No. 1:02-cv-03015-CO (D. Or. July 26, 2002), granting the defendant's motion to dismiss for lack of standing. The plaintiff in that case, a conservation organization, challenged the issuance of special use permits by the Forest Service allowing timber to be hauled from private inholdings over Forest Service roads. The plaintiff argued in part that it had standing to bring the action as a representative of its members, one of whom was Jay Lininger. Jay Lininger is one of the two individual plaintiffs in this case. After holding an evidentiary hearing at which Lininger testified, Judge Hogan determined, in relevant part, that Lininger's allegations of injury to recreational and aesthetic interests were not entitled to any weight because his testimony regarding his fishing activities were "incredible."

The Forest Service argues that Exhibit B is relevant and admissible under Federal Rule of Evidence ("FRE") 201. Under FRE 201, "a court may take judicial notice of matters of public record." Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001). "But a court may not take judicial notice of a fact that is 'subject to reasonable dispute.'" Id. at 689-690 (internal citation omitted). For example, "when a court takes judicial notice of another court's opinion, it may do so not for the truth of the facts recited therein, but for the existence of the opinion, which

is not subject to reasonable dispute over its authenticity." Id. at 690. The Forest Service argues

Exhibit B "bears upon this Court's weighing of Mr. Lininger's allegations of past and future use

of the [AFR P]roject area," and may be used to show Lininger's past actions, including his

"motive and intent." (Defs' Resp. Pls' Mot. Strike, Dckt. # 70, pp. 3-4). In other words,

defendants do more than ask the court to take judicial notice of the existence of Judge Hogan's

opinion; they offer the opinion for the truth of the facts recited therein—that Lininger submitted

false or exaggerated evidence in order to assert standing as an environmental plaintiff. This is

improper under FRE 201. M/V Am. Queen v. San Diego Marine Constr. Corp., 708 F.2d 1483,

1491 (9th Cir. 1983) (stating the general rule that "a court may not take judicial notice of

proceedings or records in another cause so as to supply, without formal introduction of evidence,

facts essential to support a contention in a cause then before it").

Plaintiffs, on the other hand, first argue that the court should exclude Exhibit B as

irrelevant under FRE 401. Relevant evidence is defined as "evidence having any tendency to

make the existence of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without the evidence." FED. R. EVID. 401. As an

initial observation, the court notes that Judge Hogan's opinion was issued over a decade ago in a

case which does not appear to involve any of the same underlying facts as the matter presently

before the court. With the exception of Lininger's involvement in both actions, defendants have

not identified any connection between the matters and none is readily apparent to the court. The

court therefore finds that Exhibit B is irrelevant under FRE 401.

Furthermore, Lininger's involvement in both actions appears to be limited to testimony in

support of standing, at the hearing before Judge Hogan in 2002 and by affidavit in the matter

before this court. Defendants offer Exhibit B as evidence of Lininger's "past actions" while

arguing that it "bears on" the credibility of his allegations in support of standing. (Defs' Resp.
Pls' Mot. Strike, Dckt. # 70, pp. 3). As such, defendants may only be understood to argue that
Lininger may be found to exaggerated his use of the AFR Project area in this case because Judge
Hogan found that he had submitted incredible testimony in the 2002 case. Offered for this
purpose, Exhibit B constitutes impermissible character evidence under FRE 404(a) and must be
excluded.

Finally, defendants argue that Exhibit B is admissible under FRE 404(b) to prove
Lininger's "motive and intent" for bringing this case. However, "FRE 404(b) contemplates
admission of evidence to show *the motive for the underlying act committed*, rather than a motive
for bringing suit." Seals v. Mitchell, No. CV 04-3764 NJV, 2011 WL 1399245, * 6 (N.D.Cal.
April 13, 2011) (*quoting* Brooks v. Haggett, No. C 07-2615 MEJ, 2010 WL 4226693, at *12
(N.D.Cal. 2010) (emphasis added)). Therefore, the exception created by FRE 404(b) does not
apply to Exhibit B.

For the reasons stated above, defendants offer Exhibit B not to demonstrate the existence
of the opinion, but for the truth of the facts recited therein. Offered for this purpose, Exhibit B is
not properly subject to judicial notice under FRE 201, and is both irrelevant under FRE 401 and
inadmissible under FRE 404. Therefore, Plaintiffs' motion to strike should be GRANTED with
respect to Exhibit B.

## III. Exhibit A

As Exhibit A to their reply in support of their cross-motion for summary judgment,
defendants offer an Oregon Uniform Citation and Complaint, citation number 0436503, bearing
the stamp and seal of the Trial Court Administrator for the Jackson County Circuit Court
attesting to the authenticity of the document. The citation records that Jay Charles Lininger was

cited on August 13, 2004, at or near Forest Service Road 2060 – Lamb Saddle, for failure to comply with a fire closure in violation of ORS § 477.550, and found guilty of and fined $94.00 for that offense on December 7, 2004.

Defendants argue Exhibit A is properly admitted under FRE 201. The fact of Lininger's conviction is a matter "not subject to reasonable dispute" and therefore properly subject to judicial notice. *See* FED. R. EVID. 201(b). The factual allegations underlying that conviction, however, are not properly subject to judicial notice. M/V Am. Queen, 708 F.2d at 1491. Some of the underlying facts have been established by plaintiffs' own evidence. In particular, Lininger himself has filed a declaration in support of standing in which he admits he used Forest Service Road 2060 on the date in question. (Third Decl. Jay Lininger Supp. Standing ("Third Lininger Decl."), Dckt. # 68, ¶ 7). Lininger argues his use of the road was in compliance with a special access permit issued to him by the Forest Service and was therefore not illegal, but also admits to the fact of his conviction. (Id., ¶¶ 4, 6, 8-11 & Ex. B).

Plaintiffs first argue that Exhibit A should be excluded as irrelevant under FRE 401.[22] However, Lininger's use of the AFR Project area is relevant to his standing to bring this action, therefore FRE 401 affords no basis for excluding Exhibit A. Plaintiffs next argue Exhibit A should be excluded as impermissible character evidence under FRE 404, but do not explain how that rule applies. If defendants offered Exhibit A to show that Lininger is disposed to violate the law, this would constitute inadmissible character evidence. *See* Henderson v. Prado, NO. C-05-0234 VRW, No. C-05-4220, 2007 WL 1229330, * 2 (N.D.Cal. April 24, 2007) ("Character is a generalized description of one's disposition, or of one's disposition in respect to a general trait,

---

[22] Plaintiffs also argue that Exhibit A should be excluded as improper expert witness testimony under FRE 702. FRE 702 governs the admission of expert witness testimony, not the admissibility of judicial records. This rule is in no way implicated by Exhibit A and affords no basis for its exclusion.

such as honesty, temperance, or peacefulness.") (*quoting* FED. R. EVID. 406, Advisory

Committee notes).  Instead, defendants offer Exhibit A as evidence that Lininger lacks standing

to bring this action.  (Defs' Resp. Pls' Mot. Strike, Dckt. # 70, pp. 4).  Thus FRE 404 affords no

basis for excluding Exhibit A.

The argument over whether Exhibit A should be excluded therefore apparently boils

down to a dispute over whether Lininger was lawfully present on the date in question.  This is a

curious argument.  Even assuming that Forest Service Road 2060 was closed on the date in

question and that the terms of Lininger's special use permit did not otherwise permit him to be

present, both of which are factual allegations underlying Lininger's conviction which are *not*

properly subject to judicial notice under FRE 201, M/V Am. Queen, 708 F.2d at 1491,

defendants do not cite, and this court has not found, any authority that holds that the temporary

closure of an area otherwise open to the public deprives an environmental plaintiff of his

aesthetic and recreational interests in that area.

In sum, and for the reasons stated above, plaintiffs' motion to strike Exhibit A should be

DENIED.

## IV. Conclusion

For the reasons stated above, plaintiffs' motion to strike should be DENIED with respect

to Exhibit A, and GRANTED with respect to Exhibit B.

## SUMMARY JUDGMENT

Plaintiffs seek an order declaring that defendants violated NFMA and the APA by failing

to comply with the Rogue River LRMP and the NW Forest Plan in approving the AFR Project;

declaring that defendants violated the HFRA and the APA by failing to comply with the Rogue

River LRMP and the NW Forest Plan in approving the AFR Project; declaring that defendants

violated NEPA and the APA in issuing the FEIS and ROD for the AFR Project; enjoining defendants from proceeding with the treatments proposed under the AFR Project in all areas except the WUI of the City of Ashland pending defendants' compliance with NFMA, HFRA, NEPA, and the APA; and awarding plaintiffs reasonable attorney fees and costs.

## STANDARDS

### Summary Judgment

Summary Judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). A dispute over a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

### Administrative Procedure Act Claims

Judicial review of agency decisions under NFMA, HFRA, and NEPA is governed by Section 706 of the Administrative Procedure Act ("APA") and may be resolved through motions for summary judgment. City of Sausalito v. O'Neill, 386 F.3d 1186, 1205 (9th Cir. 2004) ("Because the statutes . . . do not contain separate provisions for judicial review, our review is governed by the APA."); Idaho Sporting Congress, Inc. v. Rittenhouse, 305 F.3d 957, 964 (9th Cir. 2002). Under the APA, the court may set aside a final agency action only where the action is arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law. 5 U.S.C. § 706; Sierra Forest Legacy v. Sherman, 646 F.3d 1161, 1176 (9th Cir. 2011) (*quoting* Or. Natural Res. Council Fund v. Goodman, 505 F.3d 884, 889 (9th Cir. 2007) (*quoting* 5 U.S.C. § 706(2)(A)). Review under the APA is "searching and careful." Ocean Advocates v. U.S.

Army Corps of Eng'rs, 361 F.3d 1108, 1118 (9th Cir. 2004).  However, the court may not

substitute its own judgment for that of the agency.  Id.  Instead, a court:

> "will reverse a decision as arbitrary and capricious only if the agency relied on
> factors Congress did not intend it to consider, entirely failed to consider an
> important aspect of the problem, or offered an explanation that runs counter to the
> evidence before the agency or is so implausible that it could not be ascribed to a
> difference in view or the product of agency expertise."

Sierra Forest Legacy, 646 F.3d at 1176-1177 (quoting Lands Council v. McNair, 537 F.3d 981,

987 (9th Cir. 2008) (en banc), abrogated on other grounds by Winter v. Natural Res. Def.

Council, Inc., 555 U.S. 7, 20-22, 129 S.Ct. 365 (2008)).  "Agency action is valid if the agency

'considered the relevant factors and articulated a rational connection between the facts found and

the choices made.'"  Lands Council v. McNair, 629 F.3d 1070, 1074 (9th Cir. 2010) (quoting

Arrington v. Daniels, 516 F.3d 1106, 1112 (9th Cir. 2008)).

## STATUTORY BACKGROUND

The Forest Service must balance a wide variety of competing policy objectives in its

administration and management of National Forest System ("NFS") lands.  Under the Multiple-

Use Sustained-Yield Act of June 12, 1960 ("MUSYA"), 74 Stat. 215, 16 U.S.C. §§ 528-531, the

Forest Service is required to consider the "best and most judicious means" of implementing its

policy priorities, including reforestation, fire prevention, preventing soil erosion, and preserving

wildlife.  16 U.S.C. §§ 531, 551, 581j, 583.  Environmental values are integrated into the Forest

Service's decision making process through the National Environmental Policy Act of 1969

("NEPA"), Pub.L. No. 91-190, 83 Stat. 852 (1969) (codified at 42 U.S.C. § 4321 et seq.), which

obligates federal agencies to consider the environmental effects of proposed agency action and

the available alternatives.  Barnes v. U.S. Dep't of Transp., 655 F.3d 1124, 1131 (9th Cir. 2011).

The primary statute governing the administration of national forests is the National Forest

Management Act of 1976 ("NFMA"), Pub.L. No. 94-588, 90 Stat. 2949 (1976) (*codified as* 16 U.S.C. §§ 1600-1614), which requires the Secretary of Agriculture to promulgate regulations for the development of forest plans, and to develop and implement resource management plans for each unit of the National Forest System that conform not only to the MUSYA but also to the more detailed procedural and substantive guidelines set forth in the NFMA itself. 16 U.S.C. § 1604. The Forest Service must also comply with the Healthy Forests Restoration Act of 2003 ("HFRA"), Pub.L. No. 108-148, 117 Stat. 1888 (2003) (*codified at* 16 U.S.C. §§ 6501 *et seq.*), which requires the Forest Service to implement "[a]s soon as practicable" an "authorized hazardous fuel reduction project" on federal land "in wildland-urban interface areas," certain defined classes of federal land proximate to municipal water supply systems or tributaries thereof, and all federal land not otherwise included that contains habitat for threatened and endangered species, provided that certain conditions are satisfied. 16 U.S.C. § 6512(a)(1)-(3), (5).

## DISCUSSION

Plaintiffs' Complaint asserts eight claims for relief. In moving for summary judgment, plaintiffs abandoned their fourth, sixth, and eighth claims for relief. (Pl's Mem. Supp. Mot. Summ. J., Dckt. # 47, pp. 1 n. 1). The court addresses each of the five remaining claims in turn below.

## I.  NFMA claims

Counts I through IV of the Complaint allege violations of the National Forest Management Act. NFMA and its implementing regulations provide for forest planning and management at two levels: the forest level and the individual project level. *See generally* 16 U.S.C. § 1604; Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 729–30, 118 S.Ct. 1665

(1998). The Forest Service must first develop a land and resource management plan ("LRMP")

for each unit of the forest system, commonly called a "forest plan." League of Wilderness

Defenders Blue Mountains Biodiversity Project v. Allen, 615 F.3d 1122, 1125 (9th Cir. 2010)

(*citing* 16 U.S.C. § 1604(a)). Once the LRMP is approved, the forest unit is considered a

"managed forest." The Forest Service then implements the LRMP by approving or denying site-

specific actions. Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1092 (9th Cir. 2003). All

agency actions within a managed forest must be consistent with the governing LRMP. League of

Wilderness Defenders, 615 F.3d at 1125 (*citing* 16 U.S.C. § 1604(i)); 36 C.F.R. § 219.15(b).

A forest plan or LRMP broadly defines the uses allowed within the particular forest unit

but does not "directly compel specific actions." Citizens for Better Forestry v. U.S. Dep't of

Agric., 341 F.3d 961, 966 (9th Cir. 2003) (internal citations omitted). The Ninth Circuit has

"effectively treated forest plan directives as equivalent to federal regulations adopted under the

APA, deferring to the Forest Service's interpretation of plan directives that are susceptible to

more than one meaning unless the interpretation is plainly erroneous or inconsistent with the

directive." Siskiyou Reg'l Educ. Project v. U.S. Forest Serv., 565 F.3d 545, 555 (9th Cir. 2009);

*see also* Ecology Ctr. v. Castaneda, 574 F.3d 652, 661 (9th Cir.2009) ("[W]e defer to the Forest

Service's reasonable interpretation of the Forest Plan's requirements."). Accordingly, the Forest

Service's interpretation of a Forest Plan is entitled to substantial deference. *See* League of

Wilderness Defenders Blue Mountains Biodiversity Project v. U.S. Forest Serv., 549 F.3d 1211,

1223 (9th Cir. 2008) (*citing* Auer v. Robbins, 519 U.S. 452, 461–62, 117 S.Ct. 905 (1997)).

Plaintiffs assert four NFMA violation claims. They allege that the Forest Service

violated NFMA by approving treatments under the AFR Project that: (1) fail to comply with the

Rogue River LRMP's standards and guidelines for effective ground cover in the Restricted

Watershed and Restricted Riparian management areas; (2) fail to comply with the NW Forest

Plan's Aquatic Conservation Strategy ("ACS") for Riparian Reserves; (3) fail to comply with the

Rogue River LRMP's standards and guidelines for research natural areas, specifically, the

prohibition on timber harvest; and (4) fail to comply with the NW Forest Plan's standards and

guidelines for Late Successional Reserves ("LSRs").

### A. Rogue River LRMP:  Standards for effective ground cover

As Count I, plaintiffs allege the Forest Service violated NFMA by designing the AFR

Project in a manner that fails to comply with the standards and guidelines for mineral soil

exposure in nine of the Rogue River LRMP's twenty-four designated Management Areas

("MAs"), including MS-22 Restricted Watershed and MS-26 Restricted Riparian.

### <u>MS-22 and MS-26</u>

The stated goal of MS-22 is to provide water for domestic supply; accordingly, it may be

applied "only to those acres designated as suitable for Municipal Supply Watershed." (A.R.

1578).  Land management activities "are largely restricted to watershed maintenance and

protection," with the aim of achieving a "near natural condition over time." (Id.).  Timber

harvest is allowed only for the limited purpose of providing watershed protection, enhancing

water quality, or salvage following catastrophic events.  (A.R. 1582).  MS-22 allows for the

construction of fuel breaks and use prescription fire to obtain desired fuel loadings.  (A.R. 1586).

Natural fuel loadings must be maintained at a level which "meets protection standards and

resource objectives.  (Id.).  Conflicts "will be resolved in favor of the watershed resource." (A.R.

1578).

The stated goal of MS-26 is to "protect the unique habitats associated with perennial

streams" and "to protect perennial streams from detrimental changes." (A.R. 1611).  MS-26

applies only to acres designated as suitable for riparian habitat including lakes, perennial streams, and wetlands "and at a minimum, land within 100 feet horizontal distance from them." (Id.). Timber harvest is allowed only for the purpose of eliminating hazards, removal incidental to the construction or maintenance of improvements, minor unavoidable inclusions to logical management units, and salvage in the event of natural catastrophe when the salvage is not detrimental to the goals of the management area. (A.R. 1617). At least 80 percent of the normal tree crown cover must be retained. (Id.). Conflicts "will be resolved in favor of the riparian resource." (A.R. 1611).

MS-22 and MS-26 set out standards and guidelines that are intended to maintain or enhance long-term soil productivity specific to their respective MA. (A.R. 1585, 1620). These standards apply to protect all areas suitable for municipal supply watershed (MS-22) and all terrain within 100 feet horizontal distance of perennial streams, wetlands and associated riparian vegetation (MS-26). (A.R. 1578, 1611). The introductory language is identical: "Design management activities to retain effective ground cover. The mineral soil exposure *should not exceed* the following limits *overall* . . ."

| Erosion Hazard Class | MS-22 | MS-26 |
|---|---|---|
| Very slight, slight, low or moderate | 40% | 20% |
| High or severe | 30% | 10% |
| Very high or very severe | 15% | 7% |

(A.R. 1585, 1620) (emphasis added).

### The Relevant AFR Project Provision

The AFR Project provides that "the minimum-percent-effective ground cover following cessation of any soil-disturbing activity for this project" is:

//

| Erosion Hazard Class | 1st Year | 2nd Year |
|---|---|---|
| Moderate (<35% gradient) | >60% | >70% |
| Severe and Very Severe (>35% gradient) | >70% | >85% |

(A.R. 7063). The Rogue River LRMP standards and the AFR Project standards are inversely related: the Rogue River LRMP standards are stated in terms of *soil exposure* while the AFR Project standards are stated in terms of *ground cover*. By re-stating the AFR Project standards in terms of soil exposure, it becomes clear that the AFR Project deviates from the MS-22 soil exposure standards only in the "very high or very severe" category in the first year and is fully compliant with all MS-22 soil exposure standards by the second year, but deviates from all MS-26 soil exposure standards in both the first and second years:

| Erosion Hazard Class | Soil Exposure Standards | | | |
|---|---|---|---|---|
| | Rogue River LRMP | | AFR Project | |
| | MS-22 | MS-26 | 1st Year | 2nd Year |
| Very slight, slight, low or moderate | 40% | 20% | <40% | <30% |
| High or severe | 30% | 10% | <30% | <15% |
| Very high or very severe | 15% | 7% | <30% | <15% |

**Discussion**

Plaintiffs argue that both MS-22 and MS-26 contain the "unequivocal imperative" that the Forest Service "retain effective ground cover," therefore the statement that mineral soil exposure "should not exceed" the identified limits may only be read to mean that the mineral soil exposure thresholds can be more restrictive, but not less restrictive, than the stated limits. The Forest Service, on the other hand, argues that the use of the word "should" in MS-22 and MS-26 to express the mineral soil exposure limits indicate that these limits are merely planning guides, not mandatory limits. Although MS-22 and MS-26 use the word "should" to describe mineral soil exposure limits, the FEIS for the Rogue River LRMP (A.R. 0120-0647), the ROD approving

the Rogue River LRMP (A.R. 1794-1815), and the Rogue River LRMP itself (A.R. 6854-7579) establish that these thresholds are mandatory, not discretionary.

The Rogue River LRMP FEIS states that "[t]he Forest Plan's management strategies have been designed to avoid or minimize impacts. The strategies set *maximum allowable impacts* to [sic] order to maintain soil productivity; keeping impacts within the allowable limits should maintain the soil and site productivity." (A.R. 436) (emphasis added). This is consistent with its earlier statements that erosion has a detrimental impact to soil productivity, (A.R. 432), that "[t]he highly erodible granitic soils are important because they experience the most detrimental impact on soil productivity when eroded, and they are very difficult to rehabilitate," (A.R. 434), and that not only do "[p]ost-project mitigation measures seldom restore the soil to its original productivity level," many mitigation measures "create additional problems." (A.R. 436). Additional evidence that the standards and guidelines are mandatory is found in the Record of Decision ("ROD") approving the Rogue River LRMP, which states that the while the Rogue River LRMP itself provides management direction, its "Standards and Guidelines are principles *specifying conditions or levels of environmental quality to be achieved.* They are the *rules* that govern [the Forest Service's] resource management practices and are the key to successful implementation of the plan. They *will not be violated* to achieve annual targets." (A.R. 1798) (emphasis added).

Consistent with the FEIS and the ROD, the Rogue River LRMP itself provides that "land management projects *will be* designed to meet Standards and Guidelines . . . to assure that soil-site productivity goals are being met," and that riparian areas are to be given "particular consideration" and "*will be* given special attention" to achieve the objective of maintaining and improving water quality. (A.R. 1320) (emphasis added). In its chapter on implementation, the

Rogue River LRMP provides that soil productivity shall be monitored and evaluated in part by whether effective ground cover is maintained. (A.R. 1629, 1636). Whether ground cover is "effective" is measured by the degree of mineral soil exposure. The "threshold of concern," described as "the degree by which *actual performance* may vary before further evaluation is initiated," (A.R. 1629), occurs when mineral soil exposure is greater than 40% on soils rated as moderate erosion hazard, greater than 30% for soils rated as high or severe erosion hazard, and greater than 15% for soils rated very severe erosion hazard. (A.R. 1636) (emphasis added). These thresholds are explicitly incorporated in the Management Strategies for nineteen[23] of the Rogue River LRMP's twenty-four management areas, including MS-22. (A.R. 1585). Consistent with the Rogue River LRMP's provision that riparian areas shall be given "particular consideration" and "special attention," MS-26 incorporates stricter mineral soil exposure standards for Management Area 26 – Restricted Riparian. (A.R. 1620).

In sum, the Rogue River LRMP itself provides that mineral soil exposure limits are the standard for measuring actual performance and that failure to meet these limits triggers the requirement to take additional action in order to ensure that they are satisfied. The mineral soil exposure limits stated in MS-22 and MS-26 are thus performance standards, not discretionary guidelines. This conclusion is supported by the FEIS and ROD, which provide, respectively, that the Rogue River LRMP's management strategies ("MSs") set "maximum allowable impacts" that must be complied with in order to maintain soil productivity, and are "rules" that "specify[] the conditions or levels of environmental quality to be achieved" which "will not be violated." Both the Rogue River LRMP itself and its history support the conclusion that the mineral soil exposure limits stated in MS-22 and MS-26 are mandatory. This conclusion is also supported by

---

[23] (A.R. 1354, 1364, 1383, 1396-97, 1410-11, 1423, 1446, 1468-69, 1490, 1502, 1516-17, 1525-26, 1534, 1547, 1560-61, 1575, 1585, 1601-02).

the NW Forest Plan's Aquatic Conservation Strategy ("ACS"), which provides that the Forest

may not use "mitigation or planned restoration as a substitute for preventing habitat degradation"

within Riparian Reserves.  (A.R. 2004).

The Ninth Circuit has previously considered the precise forest plan provisions which are

at issue in this case.  In Oregon Natural Resources Council Fund v. Goodman, the plaintiffs

challenged the Forest Service's approval of the proposed expansion of the Mount Ashland Ski

Area ("MASA").  505 F.3d 884, 893 (9th Cir. 2007).  The plaintiffs argued that the Forest

Service had violated the NFMA by failing to designate LHZ 2 land as Riparian Reserve, and that

this failure to properly designate the land resulted in further violations of the Rogue River

LRMP, the NW Forest Plan, and the NFMA, because "a proper designation as Riparian Reserve

would compel specific management practices to ensure that the terrain is appropriately

protected."  Id. at 896.  The Ninth Circuit began by noting the "complex and overlapping" rules

governing the designation and management of Riparian Reserves and watersheds, requiring the

Forest Service to comply with both the NW Forest Plan's Aquatic Conservation Strategy

("ACS") and "the Rogue River LRMP's more restrictive standards and guidelines for lands

designated as Restricted Riparian, Management Strategy 26 (MS 26) and for lands designated

Restricted Watershed, Management Strategy 22 (MS 22)."  Id. at 893-94.

The Ninth Circuit stated that MS-26 "*mandates* that management activities in Riparian

Reserves *should not exceed*" the stated soil exposure standards; that the NW Forest Plan's ACS

"*prohibits* the Forest Service from 'us[ing] mitigation or planned restoration as a substitute for

preventing habitat degradation' within Riparian Reserves"[24] and requires that habitat protection

be given priority over mitigation and restoration; and that MS-22 establishes "*specific* soil

---

[24] *See* NW Forest Plan, Standards and Guidelines, Riparian Reserves, Watershed and Habitat
Restoration, WR-3: "Do not use mitigation or planned restoration for preventing habitat
degradation."  (A.R. 2004).

disturbance standards and guidelines" and "*requires* that management activities on Restricted

Watershed MS 22 lands *not exceed*" the stated soil exposure standards. Id. at 894 (emphasis

added). Accordingly, after finding that the Forest Service violated NFMA by failing to designate

LHZ 2 lands as Riparian Reserves, the Ninth Circuit granted the plaintiffs' request for injunctive

relief, finding that until the lands were properly classified as Riparian Reserve and Restricted

Watershed and the proposed treatments subjected to the additional scrutiny required by these

classifications, the possibility of environmental harm remained. Id. at 898.

The parties in this case do not address the Ninth Circuit's express conclusion that the

mineral soil exposure limits set by MS-22 and MS-26 are mandatory. Instead, the Forest Service

relies on Lands Council v. McNair, 629 F.3d 1070 (9th Cir. 2010), Ecology Center v. Castaneda,

574 F.3d 652 (9th Cir. 2009), and Western Watersheds Project v. U.S. Department of Interior,

Civ. No. 08-0506-E-BLW, 2009 WL 5218020 (Dec. 30, 2009) in arguing that where a forest

plan uses the word "should," as both MS-22 and MS-26 do, the relevant provision creates a

planning guideline, not a mandatory standard. These cases, however, are distinguishable from

the case before this court.

In Lands Council v. McNair, the plaintiffs challenged the Forest Service's approval of a

project to thin 277 acres of old-growth forest. 629 F.3d at 1072. In relevant part, the plaintiffs

challenged the scientific reliability of the database used by the Forest Service to demonstrate

compliance with the forest plan's 10%-minimum-old-growth standard, arguing that the database

was unreliable in part because it was based on surveys of sample plots one-sixth of an acre in

size, which did not meet the forest plan's minimum 25-acre old-growth size requirement. Id. at

1078. To establish the 25-acre old-growth requirement, the plaintiffs relied on a forest plan

provision stating that "one or more old-growth stand per old-growth unit should be 300 acres or

larger.... The remaining old-growth management stands should be at least 25 acres in size. Preferred size is 80 acres." Id.  Although the plaintiffs had not administratively exhausted this argument in either its administrative appeal or the proceedings before the district court, the Ninth Circuit nevertheless considered the argument and found that the Forest Service's reliance on the database was not arbitrary and capricious. Id. at 1078-79.  The court articulated a number of considerations supporting this conclusion, in relevant part that the provision on which the plaintiffs relied merely stated an objective to be used as a guide for planning purposes.  Id. at 1078 (citing Castaneda, 574 F.3d at 660-61).

Similarly, the plaintiff in Ecology Center v. Castaneda argued in relevant part that tree stands designated as old-growth were required to be 50 acres at a minimum and should be 100 acres or more, relying on Old Growth Guidelines from a Forest Service Manual which were attached as an appendix to and specifically incorporated by the forest plan. 574 F.3d at 660.  The guideline provided that "[u]nits of 50-100 acres are the smallest acceptable size . . . While units of a minimum of 50 acre units may be acceptable in some circumstances, 50 acres should be the exception rather than the rule," that "[e]fforts should be made to provide old growth habitat in blocks of 100 acres or larger," but that units of less than 50 acres "may still be useful habitat" in certain circumstances. Id. at 660-61.  The Ninth Circuit found that this guideline "suggests how old growth should be managed, not how it must be designated," and therefore did not create a mandatory minimum acre requirement. Id. at 661.

Finally, in Western Watersheds Project v. U.S. Department of Interior, the plaintiffs challenged a Final Decision by the Bureau of Land Management ("BLM") authorizing grazing permits on federal rangeland containing environmentally sensitive areas.[25]  2009 WL 5218020,

---

[25] An Administrative Law Judge ("ALJ") found that the grazing permits' utilization limits were discretionary and thus unenforceable, and the Interior Board of Land Appeals ("IBLA")

*1-3. The BLM's Final Decision provided that grazing "will follow" a rotation grazing schedule set out as a "term and condition" of the grazing permits, violation of which could subject the permit holder to civil and criminal penalties. Id. at * 8. In a separate section labeled "Management Guidelines," the Final Decision set forth utilization limitations for the grazing permits stating that actual utilization "should not exceed" certain target percentages. Id. Noting that the record reflected that the grazing permit holders had lobbied for the utilization limits to be voluntary and the BLM had responded by confirming that they would be, and that nothing about the BLM's decision indicated that the word "should" suggested it was used in a mandatory sense, the court held that the utilization limits were voluntary, not mandatory. Id. at * 9-10.

McNair, Castaneda, and Western Wildlands Project are distinguishable from the facts of this case. McNair does not provide any meaningful discussion of why the provision at issue was discretionary rather than mandatory. Furthermore, because the Ninth Circuit found that the plaintiffs had not administratively exhausted the issue of whether the provision created a mandatory standard, that claim was not subject to judicial review. Idaho Sporting Congress, 305 F.3d at 965. Therefore, the Ninth Circuit's passing comment that the statute was discretionary is dicta. Moreover, McNair did not involve a direct challenge to the minimum acre size requirement but rather involved a challenge to the scientific reliability of a database. Finally, whereas the provision at issue in McNair provided a range of values for the size of old-growth stands, stating that one or more should be 300 acres, the remainder should be "at least" 25-acres, and that the desired or preferred size was 80 acres. By comparison, MS-22 and MS-26 set specific numeric performance standards for measuring mineral soil exposure that apply

---

reversed. 2009 WL 5218020, * 5. As part of its review, the court was required to first determine whether the grazing permits' utilization limits were discretionary, in order to next determine whether the IBLA's failure to discuss the ALJ's determination on that issue rendered the IBLA's decision arbitrary and capricious. Id. at *10.

uniformly to three erosion hazard classifications, and required that in the event these standards are not met additional action must be taken.

As with the provision in McNair, the provision at issue in Castaneda identified a range of unit acre sizes described as desired conditions (greater than 100 acres), acceptable conditions (50-100 acres), and disfavored conditions that might be tolerated in exceptional circumstance (less than 50 acres). Castaneda is therefore distinguishable from this case for the same reason as McNair: MS-22 and MS-26 simply do not create a range of mineral soil exposure limits that are preferred, acceptable, and disfavored, they create discrete, specific numeric performance standards that apply uniformly and require additional action to cure non-compliance in the event that they are not satisfied.

Finally, the Rogue River LRMP sets out its Management Strategies ("MSs") in a section titled "Forest Management Direction," it sets out "Best Management Practices" ("BMPs") and riparian reserve[26] management guidelines separately in Appendix D. (A.R. 1728-1737). The MSs are thus analogous to the "terms and conditions" found to be mandatory in Western Watershed Project, while the BMPs are like the discretionary "utilization guidelines." As described above, the FEIS and ROD for the Rogue River LRMP both include language supporting the conclusion that the MSs are and always have been conceived as mandatory limits, not discretionary guidelines. The guidelines for implementation methodology are instead found in the BMPs. For example, the AFR Project FEIS defines "effective ground cover" to mean "any material (i.e. rock, litter, vegetation), which is attached to, or lying on the soil surface." (A.R. 7063). The mineral soil exposure limits in MS-22 and MS-26 do not dictate what kind of

_____

[26] Appendix D to the Rogue River LRMP is titled "Streamside Management Guidelines and Best Management Practices." The AFR Project FEIS identifies the term "streamside" as "dated terminology," specifically noting that the "Streamside management Unit now falls under Riparian Reserve." (A.R. 6973).

material must be retained or how it should be dispersed, they merely establish that the material must cover a certain percentage of the soil.

The Forest Service also argues that the "Watershed Protection and Management" supplement to the Regional Forest Service Manual, FSM 2520 R-6 Supplement No. 2500.98-1, (A.R. 2589-2595), supports its reasoning that the mineral soil exposure standards are meant to be "flexible." The court disagrees. The Rogue River LRMP is supplemented by the Forest Service Manual ("FSM"), however, where the Rogue River LRMP provides specific standards and guidelines, those standards and guidelines have the force of law and must be applied. Both MS-22 and MS-26 provide that conflict "will be resolved in the favor of the" resource they address, restricted watersheds and restricted riparian, respectively. (A.R. 1578, 1611). Although both MS-22 and MS-26 provide for the treatment of activity fuels, MS-22 states that "hazard reduction activities will be compatible with management area objectives," (A.R. 1587), while MS-26 requires that the Forest Service "[t]reat activity fuels to a level which meets protection standard and resource objectives," (A.R. 1621). MS-22 further provides that "[v]egetation shall be reestablished *within one year*" when roads that are no longer needed are decommissioned and obliterated. (A.R. 1585) (emphasis added).

The Forest Service argues that even if MS-22 and MS-26 are mandatory standards, they require only that mineral soil exposure standards are to be maintained "overall" without defining whether that term is geographic or temporal, thus treatments need not comply with the mineral soil exposure standards at the time they are applied so long as the standards will actually be achieved over time. This argument is belied by the Rogue River LRMP's chapter on implementation, which provides that the "unit of measure" for "soil productivity" is acres, not years. (A.R. 1629, 1636). This is particularly true in light of the fact that years <u>are</u> the unit of

measure for other actions or effects to be monitored during implementation, and the "threshold of concern" for certain elements is expressed as a change in condition over time.  (See A.R. 1633-1639).

### Conclusion

The disputed provisions of MS-22 and MS-26 are not discretionary guidelines, they are mandatory standards designed to achieve the objectives specific to their respective management areas.  By failing to design the AFR Project in a manner that complies with these provisions of the Rogue River LRMP, the Forest Service violated the NFMA.  Goodman, 505 F.3d at 895 ("It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA.") (*quoting* Native Ecosystems Council v. U.S. Forest Serv., 418 F.3d 953, 961 (9th Cir. 2005)).  Contrary to the Forest Service's argument, there is no *de minimis* exception for non-compliance with mandatory Forest Plan requirements.  Id.  Plaintiffs are therefore entitled to summary judgment on their first claim for relief.

### B.  Aquatic Conservation Strategy

As Count II, plaintiffs allege the Forest Service violated NFMA by designing the AFR Project in a manner that fails to comply with the NW Forest Plan's Aquatic Conservation Strategy ("ACS").  The Complaint alleges the AFR Project excludes potentially unstable areas from Riparian Reserve; allowing ground disturbing activities within properly functioning Riparian Reserves without establishing that those activities are necessary; failing to minimize disturbance of ground cover and vegetation; substituting mitigation and planned restoration over preservation and protection; and failing to ensure the effectiveness of the proposed mitigation measures and restoration activities.  On summary judgment, plaintiffs argue primarily that the AFR Project fails to designate LHZ 2 lands as Riparian Reserves.

**Aquatic Conservation Strategy ("ACS")**

The NW Forest Plan's ACS "was developed to restore and maintain the ecological health

of watersheds and aquatic ecosystems contained within them on public lands." (A.R. 1942).

The ACS identifies nine objectives (A.R. 1944) that are to be achieved through a four-part

strategy. (A.R. 1944-45). Compliance with the ACS objectives "means that an agency must

manage the riparian-dependent resources to maintain the existing condition or implement actions

to restore conditions." (A.R. 1943). The ACS requires the Forest Service to designate riparian

reserves and key watersheds; conduct watershed analyses in key watersheds, roadless areas in

non-key watersheds, and riparian reserves; and develop a comprehensive, long term watershed

restoration program. (A.R. 1945, 1953). Activities that "retard or prevent attainment" of the

nine ACS objectives for Riparian Reserves are prohibited and regulated by the ACS standards

and guidelines. (A.R. 1944-1945). "Riparian Reserves include the body of water, inner gorges,

all riparian vegetation, 100-year floodplain, landslides and landslide prone areas." (A.R. 1950).

**Discussion**

In their opening brief, plaintiffs argued that the AFR Project fails to treat LHZ 2 lands as

Riparian Reserves. (Pls' Mem. Supp. Mot. Summ. J., Dckt. # 47, pp. 13-16). Plaintiffs take a

modified position in their reply brief, arguing that the FEIS for the AFR Project did not

adequately analyze and address the impacts to Riparian Reserves. (Pls' Reply Supp. Mot.

Summ. J., Dckt. # 61, pp. 9). Plaintiffs argue that the AFR Project's 2005 Draft EIS explicitly

relies on the 2003 UBA, which did not designate LHZ2 lands as Riparian Reserves.[27] They point

out that in 2007, the Ninth Circuit held that the Forest Service violated the NW Forest Plan by

failing to designate LHZ 2 areas within the Forest as Riparian Reserves. Goodman, 505 F.3d at

---

[27] See 2003 UBA, Table 1-5 – Landslide Hazard Zonation Descriptions, describing LHZ 2 and
stating "[t]his area is not designated as Riparian Reserve under the [NW Forest Plan]." (A.R.
4277).

895. Plaintiffs acknowledge that the AFR Project's FEIS references LHZ 2 areas in its analysis, but argue that these references are entirely superficial changes made by the Forest Service in the attempt to bring the FEIS into compliance with Goodman without actually updating or modifying the substantive analysis and approach.

In support of this theory, plaintiffs point out that the 2004 Draft EIS and the 2008 FEIS contain largely identical discussions of the impacts to Riparian Reserves, and that while the FEIS discusses the environmental consequences resulting from treatments specifically within LHZ 1 areas, it contains no similar discussion with regard to the treatments proposed within LHZ 2 areas. They point out that "Preferred Alternative" proposes to treat a combines 1,566 acres of LHZ 1 and LHZ 2 areas, but only 985 acres of Riparian Reserves, and argues that the 581 acre discrepancy in these two figures indicates that the Forest Service did not treat of LHZ 2 areas as Riparian Reserves.

The figures on which plaintiffs rely are found in Chapter II, section E, subsection (d) of the AFR Project's FEIS, which presents in tabular form a comparison of the four action alternatives in terms of their estimated impacts on twenty-nine "significant" and "other" issues. (A.R. 6997-7004). Specifically, Table II-11 presents a detailed comparison of the four proposed action alternatives and their associated impacts on each of the eleven identified "significant issues," (A.R. 7001-7002), and Table II-12 presents a detailed comparison of the four proposed action alternatives and their associated impacts on the eighteen identified "other issues," (A.R. 7002-7004). Table II-11 shows that the treatments proposed under the selected "Preferred Alternative" will impact 1,566 acres of landslide prone lands: 606 acres of LHZ 1 lands and 960 acres of LHZ 2 land.[28]  (A.R. 7001). However, Table II-11 also shows that the "Preferred

---

[28] See Significant Issue number 2, Slope Stability.

Alternative" will only impact 985 acres of Riparian Reserves. [29] (Id.). To add to the confusion, Table II-12 shows that the "Preferred Alternative" will only impact 743 acres of Riparian Reserves.[30] (A.R. 7003).

It is clear that plaintiffs are skeptical of the Forest Service's analysis. The unexplained inconsistencies in Table II-11 and Table II-12 raise questions about data accuracy. However, these tables are summaries only, not definitive prescriptions. The record does not support the conclusion that the Forest Service failed to designate and treat LHZ 2 areas as Riparian Reserves. As initially developed, the Forest Service's plan for the AFR Project made a distinction between LHZ 1 and non-LHZ-1 areas. This plan, which appears as the Proposed Action in both the Draft EIS and FEIS, proposed "modified treatments" to protect of LHZ 1 areas and Riparian Reserves, (A.R. 5488, 6997-6998), but did not extend these "modified treatments" to the estimated 736 acres of LHZ 2 area that would be impacted by the project, (A.R. 5491, 7001). Accordingly, the "Background and Prescriptions" for the Proposed Alternative, set out as Exhibit B to the FEIS, (A.R. 7350-7386), declares that "[u]nstable lands mapped as LHZ 1 are considered part of the Riparian Reserve network" but omits mention of LHZ 2 areas, (A.R. 7351), and sets out a decision making process that makes a distinction between LHZ 1 areas and non-LHZ 1 areas, (A.R. 7350-7386).

However, the Proposed Alternative was developed prior to the Ninth Circuit's 2007 holding in Goodman that LHZ 2 areas must be designated as Riparian Reserves. While it appears that the Forest Service did not update this decision making process to conform with the Ninth Circuit's holding in Goodman, this is ultimately irrelevant because the Proposed

---

[29] See Significant Issue number 4, Hydrologic Function.
[30] See Other Issue number 8, Terrestrial Wildlife – Other Special Habitats and Species.

Alternative was not selected for implementation. Instead, the Forest Service developed and selected the Preferred Alternative for implementation.

The "Preferred Alternative" proposes "modified treatments" to protect both LHZ 1 *and* LHZ 2 areas. (A.R. 6998-6999). The "Background and Prescriptions" for the Preferred Alternative, documented in Appendix D to the FEIS, (A.R. 7400-7417), first divides the AFR Project area into four general treatment areas, then sets out a decision making process that organizes the treatments to be applied according to the Plant Association Groups ("PAGs") developed and described in the 2003 UBA. The Preferred Alternative's "Background and Prescriptions" for the repeatedly reiterates that, for each PAG, additional ground cover will be maintained "[o]n those unstable areas mapped as Landslide Hazard Zone 1 or 2." (A.R. 7403-7406, 7408, 74107412-7417). The AFR Project's FEIS also mentions LHZ 2 areas as a factor to be considered in its discussion on slope stability. (A.R. 7068-7073).

While the record suggests that LHZ 1 and 2 areas and Riparian Reserves overlap to some degree, it is unclear whether these areas are coextensive.[31] LHZ ratings are indicators of slope stability. The NW Forest Plan "does not limit the designation of Riparian Reserves to only those acres immediately surrounding streams." Or. Natural Res. Council Fund v. Brong, No. Civ. 04-693-AA, 2004 WL 2554575, ate *11 (D. Or. Nov. 8, 2004). However, the NW Forest Plan

---

[31] The Forest Service mapped Riparian Reserves in conjunction with the 2003 UBA, (A.R. 4287-4289), the results of which are shown in Map 1-9, 2003 NFSL Riparian Reserves. (A.R. 4289). The Forest Service also completed Landslide Hazard Zonation mapping in conjunction with the 2003 UBA, (A.R. 4276), the results of which are shown in Map 1-8, Revised Landslide Hazard Zonation – 2003, (A.R. 4280). The Landslide Hazard Zonation mapping information in Map 1-9 was updated in several ways subsequent to the 2003 UBA. (A.R. 7008). At the time of the AFR Project's 2004 Draft EIS, the most accurate assessment of the conditions within the AFR Project Area were documented in Map D-1, "LHZ Updates," (A.R. 5753), in Appendix D to the Draft EIS, (A.R. 5750-5760). Comparing Map D-1 to Map 1-8, the total number of acres identified and mapped as LHZ 1 and LHZ 2 increased between the time the Forest Service issued the 2003 UBA and the 2004 Draft EIS, although the total acres are not provided. The court has not found an updated map of Riparian Reserves in the record.

provides that "Riparian Reserves are designated for all permanently-flowing streams, lakes, wetlands, and intermittent streams." (A.R. 1950). Thus, it appears that an unstable slope that is prone to landslide but nowhere near a stream, lake, or wetlands might properly be designated as LHZ 1 or 2 but would fall outside the definition of a Riparian Reserve. Nothing in the record suggests that in completing its Landslide Hazard Zonation mapping, the Forest Service only designated those landslide prone areas near or adjacent to a body of water as LHZ 1 or 2. Accordingly, although there are data discrepancies in Tables II-11 and II-12, the court cannot conclude that those discrepancies are the result of the Forest Service's failure to designate LHZ 2 areas as Riparian Reserves.

### Conclusion

Although there are unexplained inaccuracies in the summary data presented in Tables II-11 and II-12 of the AFR Project's FEIS, the treatments proposed under the Preferred Alternative describes both LHZ 1 and LHZ 2 areas as "unstable" and requires that "modified treatments" be applied to these areas for that reason. These prescriptions suggest that the Forest Service responded appropriately to the Ninth Circuit's decision in Goodman by designating LHZ 2 areas as Riparian Reserves, and that the discrepancies in Tables II-11 and II-12 are clerical errors. The Forest Service is therefore entitled to summary judgment on plaintiffs' second claim for relief.

### C. Ashland RNA

As Count III, plaintiffs allege the Forest Service violated NFMA by designing the AFR Project in a manner that fails to comply with the Rogue River LRMP's standards and guidelines for research natural areas. Specifically, plaintiffs argue that the AFR Project will allow extensive timber harvest within the Ashland RNA which is explicitly prohibited by the Rogue River LRMP.

### 1. AFR Project: Treatments Proposed Within Ashland RNA

In total, the Forest Service estimates that 18,000 to 25,000 CCF (hundred cubic feet) of biomass from trees greater than 11 inches in diameter will be removed from the Preferred Alternative's 7,600 acre project area. (A.R. 7123). It is undisputed that the Forest Service proposes to either sell the commercially viable trees to be taken during the AFR Project's thinning treatments in a commercial timber sale or trade the value of the commercial timber for the cost of non-commercial thinning and fuel treatments through stewardship contracting. (A.R. 7123, 7831). While a stewardship contract is not a direct sale, the value of the products generated may exceed the cost of the services rendered, resulting in residual receipts which may either be transferred to another stewardship contracting project or directed to trust funds. (A.R. 6910). Whether sold or traded, the trees will ultimately be used by for commodity production by the timber products industry. (A.R. 6893, 7306). At an estimated value of $4-8 million, these trees will contribute substantially to and potentially even cover the AFR Project's estimated $7-10 million implementation cost. (A.R. 7123-7124).

It is further undisputed that the AFR Project proposes to remove trees from within the Ashland RNA through the application of thinning treatments. The AFR Project proposes to treat all but 26 acres of the Ashland RNA: of the 1,306 acres within the Ashland RNA,[32] 1,280 acres are scheduled for treatment. (A.R. 7824, 7834). The overall treatment strategy for the Ashland RNA is to "selectively remove competition to existing large ponderosa or sugar pine and Douglas-fir to create conditions that would encourage regeneration of the pine species," (A.R.

---

[32] As described above in footnote 13, the most technically precise mapping of the Ashland RNA, completed by the Forest Service during the 2003 UBA, establishes that the Ashland RNA contains 1,306 acres. (A.R. 4235, 4241).

6958, 6963),[33] primarily through the application of "variable density management" treatments,[34] which are scheduled to occur on 624 acres[35] within the Ashland RNA, (A.R. 7820-7821). Per acre, those variable density management treatments are projected to remove a minimum of 7 trees per acre and a maximum of 16 trees per acre: 7-13 trees 17-24 inches in diameter and 0-3 trees greater than 24 inches in diameter. (A.R. 7119). Accordingly, the AFR Project proposes to remove a minimum of 4,368 trees and maximum of 9,984 trees from within the Ashland RNA. In terms of the number of trees removed, the thinning treatments proposed for the Ashland RNA are the most intense of all the thinning treatments proposed by the AFR Project. (Id.).

The Forest Service has selected the Preferred Alternative for implementation. (A.R. 7811). The prescriptions for the thinning treatments proposed under the Preferred Alternative are described in detail in Appendix D to the final EIS, is organized first by "Strategic Category" and second by PAG. (A.R. 7400-7417). The PAG treatments for the Ashland RNA describe, by slope aspect, the density to be achieved; require that additional ground cover to be maintained on LHZ 1 and 2 areas; describe the conditions under which prescription burning should be applied; and describe in detail the trees to be reserved or removed by species, diameter, crown radius, and percent live crown ratio. (A.R. 7410-7416). In all instances the prescriptions require that the "largest and most vigorous trees" be retained "regardless of distribution."

---

[33] Describing treatments within the Ashland RNA proposed by the Preferred Alternative, the alternative selected for implementation by the AFR Project's ROD.

[34] "Variable density management" involves "the selective removal of some trees within a forested stand," (A.R. 6857), commonly achieved by the methodology of "thinning from below," a silvicultural treatment that achieves the desired density by cutting or removal, beginning with the smallest diameter trees and moving up in size class until the desired objective is met, (A.R. 6911).

[35] As described above in the Factual and Procedural Background, Section VI, subsection F(1), the ROD mitigates the Preferred Alternative's proposal to treat 780 acres within the Ashland RNA with variable density management treatments by reducing the number of acres to be treated by 20%. (A.R. 7864). Accordingly, only 624 acres within the Ashland RNA will be treated with variable density treatments.

## 2.  Rogue River LRMP:  MS 25 – Research Natural Areas

The Rogue River LRMP provides that Research Natural Areas ("RNAs") are "a part of a

National network of important ecological areas established for non-manipulative research,

observation, education and study." (A.R. 1323).  The management objective for RNAs is to

maintain the "natural quality" and "the cells and vegetation communities that led to the

establishment or recommendation of the areas as RNAs," a strategy which may also contribute to

the goal of maintaining  or enhancing biological diversity because there is no programmed

timber harvest and ground disturbing activities are discouraged or prohibited.  (Id.).

The Rogue River LRMP sets out the standards and guidelines specific to research natural

areas in Management Strategy 25 ("MS-25").  The stated goal of MS-25 is "[t]o provide areas

for research, observation and study of undisturbed ecosystems.  Maintenance of natural processes

within each area will be the prime consideration." (A.R. 1604).  Research natural areas

("RNAs") are described as landscapes consisting of "naturally established patterns of vegetation"

that "will be protected to preserve the natural features for scientific purposes and natural

processes allowed to dominate." (Id.).  RNAs are intended to serve three main purposes:  as "(1)

[b]aseline areas against which effects of human activities can be measured, (2) [s]ites for study

of natural processes in undisturbed ecosystems, and (3) [g]ene pool preserves for all types of

organisms." (Id.).

"Timber harvesting is not allowed in a Research Natural Area." (A.R. 1607).  Firewood

cutting is likewise prohibited, (id.), as is the "gathering of forest products" (A.R. 1604).

However, MS-25 provides that "[f]uels will be managed to meet the intent of the objectives of

the [RNA].  Fuel treatment methods will be approved by the Director of the Forest and Range

Experiment Station." (A.R. 1610). Conflicts between the RNA and other resources "will be resolved in favor of the [RNA]." (A.R. 1604).

### 3. Discussion

Plaintiffs argue the AFR Project violates MS-25's prohibition on "timber harvest" by proposing extensive tree removal within the Ashland RNA. The Forest Service counters that MS-25 prohibits "timber harvest," not tree removal. Because any financial return on the thinning treatments proposed within the Ashland RNA are incidental to the project's purpose of reducing hazardous fuels, the Forest Service argues the treatments do not constitute a "timber harvest." Alternatively, the Forest Service argues that the Director of the Forest and Range Service Station may approve "timber harvest" as a fuels treatment method.

### a. Meaning of the term "timber harvest"

Neither the NFMA nor the Rogue River LRMP defines the term "timber harvest," therefore the court applies the common meaning of the terms. *See* Lands Council v. Martin, 529 F.3d 1219, 1223 (9th Cir. 2008) (internal citation omitted). The noun "timber" commonly means "growing trees or their wood; a wooded area: forest; a standing tree or its trunk." *See, e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2394 (1986). The noun "harvest" commonly means "the act or process of gathering in a crop" or "the gathering in of something other than a crop," while the verb "harvest" means "to gather in a crop" or "to gather (a natural product) as if by harvesting ... <-timber>." *See* id. at 1036. Thus, the common meaning of "timber harvest" is the act or process of gathering a standing tree or its trunk.

Plaintiffs argue that the term "timber harvest" is synonymous with "tree removal." The Forest Service acknowledges that tree removal will occur within the Ashland RNA under the AFR Project, but argues that more is required. The Forest Service is correct.

In prior unrelated litigation, the Forest Service has successfully argued that "a 'timber harvest' requires (a) some aspect of commercial sale or consumption, and (b) the downed trees be removed from the site." Hogback Basin Pres. Ass'n v. U.S. Forest Serv., 577 F.Supp.2d 1139, 1156 (W.D. Wash. 2008) (deciding the meaning of the undefined term "timber harvest" as used in the NW Forest Plan). This meaning is consistent with the manner in which the Rogue River LRMP uses the term "timber harvest." The Rogue River LRMP identifies timber as a Forest resource used as a raw material by Rogue Valley wood processors. (A.R. 1297-1298). To satisfy the demand for this resource, the Rogue River LRMP includes "timber," described as the "production of wood fiber," as a Forest management goal. (A.R. 1315). Under the title "vegetation and timber," (A.R. 1323-1331), the Rogue River LRMP elaborates that "[t]imber harvest will include a full spectrum of silvicultural methods, depending on site specific conditions and management direction. Methods may include clearcutting, shelterwood, seed-tree, group selection, and individual tree selection." (A.R. 1324). The Glossary for the Rogue River LRMP's FEIS ("Rogue River Glossary") defines the clearcutting (A.R. 0602), shelterwood (A.R. 0615), group selection cutting (A.R. 0606) and individual tree removal, (A.R. 0607), to mean tree removal accomplished by a particular methodology. Reading these provisions together, the Rogue River LRMP uses the term "timber harvest" to describe tree removal by any silvicultural method that produces wood fiber for use in the timber products industry.

In light of these provisions, the court cannot say that the Forest Service's determination that a "timber harvest" requires a commercial sale or consumption element is arbitrary and capricious.

//

//

### b.  "Timber harvest" need not be scheduled or programmed

The Forest Service argues that the economic element is not satisfied in this case because the term "timber harvest" should be read to mean only scheduled or programmed timber harvest. This argument lacks merit.

Twenty-two[36] of the Rogue River LRMP's twenty-four management strategies contain standards and guidelines for "timber." While only ten of management strategies allow for scheduled or programmed timber harvest,[37] ten additional management strategies expressly allow non-scheduled "timber harvest" under specific circumstances with varying degrees of restriction. MS-10 Wild River allows salvage timber sales in the event of "catastrophic fire or insect epidemic situations, if removal does not seriously impair" management area goals. (A.R. 1443). MS-3, MS-5, MS-12, MS-15, and MS-19 provide that "[t]imber harvest can only take place if it benefits" the resource the management area was established to protect, except that timber harvest will be allowed "in catastrophic situations such as salvage of fire or insect damage and to prevent the spread of insects and disease to areas managed for other purposes or to meet the management objectives." (A.R. 1361, 1380, 1466, 1499, 1544) (emphasis added). Finally, MS-22 Restricted Watershed provides that any timber harvest that occurs "will be limited to that necessary to (a) provide watershed protection or enhance water quality, [or] (b) salvage catastrophic events such as fire, blowdown from windstorms, or insect and disease epidemics." (A.R. 1582) (emphasis added).

---

[36] The two management strategies that do not address "timber harvest," MS-17 Primary Range and MS-18 Secondary Range, provide that "[p]ractices to eliminate tree encroachment on these areas will be utilized." (A.R. 1523, 1531).

[37] Ten of the Rogue River LRMP's management areas are dedicated to providing either full or reduced timber yields, (A.R. 1324), accordingly, "timber harvest" is scheduled or programmed under the following management strategies:  6, 7, 8, 9, 11, 14, 16, 20, 21, and 23. (A.R. 1391, 1405, 1418, 1431, 1454, 1484, 1510, 1555, 1570, 1595).

In light of these provisions, the Forest Service's determination that the term "timber harvest" applies only to scheduled or programmed activities is arbitrary and capricious.

### c. Authority to approve "fuel treatment methods" does not include authority to approve "timber harvest"

The Forest Service argues that the Director of the Forest and Range Experiment Station may approve a "timber harvest" under the otherwise not prohibited management activity of fuel treatments and MS-25's specific grant of authority to approve "fuel treatment methods." This argument lacks merit.

Neither the NFMA nor the Rogue River LRMP defines the term "fuel treatment," therefore the court applies the common meaning of the terms. *See* Lands Council, 529 F.3d at 1223. The noun "fuel" commonly means "a material (as coal, coke, gas, oil, peat, wood) often used to produce heat or power by burning: something that feeds fire," while the noun "treatment" commonly means "the action or manner of treating: as . . . subjection of something to the action of an agent or process [or] the action or manner of dealing with something often in a specified way." *See, e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 918, 2435 (1986). Thus, the common meaning of "fuel treatment" is an action or manner of dealing with a material that feeds fire.

The Forest Service proposes that the authority of the Forest Director to approve "fuel treatment methods" should be read to encompass the authority to approve "timber harvest." This definition is unworkable because it would render MS-25's prohibition on timber harvest a virtual nullity. Had the Forest Service intended to allow "timber harvest" within the Ashland RNA, it would have included a provision in MS-25 akin to the provisions in MSs 3, 5, 12, 15, and 19, which allow timber harvest when it "benefits" the management area or is necessary to "meet management objectives."

Nothing in the record suggests that the omission of such provision in MS-25 is inadvertent or unintentional. The Rogue River LRMP's final EIS expressly acknowledges that "Research Natural Areas are excluded from timber harvest and all other ground-disturbing activities," (A.R. 0273), and that the "[s]election criteria for RNAs stress the absence of major human disturbance []. Timber harvest usually makes a potential site unsuitable for RNA status," (A.R. 0462). Consistent with these statements, MS-25 expressly prohibits "timber harvest," one of only two management strategies[38] to do so. Not coincidentally, the Rogue River LRMP ranks MA 25 – Research Natural Area as the third most restrictive management area in its "priority rankings." (A.R. 1344). Not only does MS-25 prohibit timber harvest, it prohibits physical improvements for recreation purposes (A.R. 1604); discourages dispersed recreation activities (id.); prohibits off-road vehicle recreational use (A.R. 1605); prohibits aggregate source development, utility corridors, and construction of non-essential facilities, roads, and trails (A.R. 1609); and prohibits the gathering of forest products and firewood cutting. (A.R. 1604, 1607). These restrictions all advance the purpose for which the Ashland RNA was established (to provide an "undisturbed example of Pacific ponderosa pine-Douglas fir" for scientific and educational study and a "control site for comparison with others influenced by man" (A.R. 12)) and its management goals (providing "[b]aseline areas against which effects of human activities can be measured" and "sites for study of natural processes in undisturbed ecosystems" (A.R. 1604)).

In light of these provisions, it would be a clear error of judgment to read MS-25 as allowing the Director of the Forest and Range Experiment station to approve a "timber harvest" as a "fuel treatment method."

---

[38] MS-13 – Wilderness provides that "[t]imber management activities are not applicable in this management area." (A.R. 1474). The Rogue River LRMP ranks MA 13 – Wilderness as the most restrictive management area in its "priority rankings." (A.R. 1344).

### d.  Authority to approve "fuel treatment methods" is not limited to approving prescribed burning

Plaintiffs argue that the Director's authority to approve fuel treatment methods is specifically limited to the authority to approve prescribed burning.  This definition is unworkable because it is simply too restrictive.

Rogue River LRMP's FEIS provides that "[f]uels management will consist of the treatment of both project-generated fuels and natural fuels Forest-wide.  Treatment methods available in all alternatives include rearrangement, removal, and burning."  (A.R. 0195). Although the Rogue River LRMP's FEIS discusses fuels management in both its chapter on the affected environment and its analysis of the environmental consequences associated with implementation of the Forest plan, it contains very limited discussion of what "fuels management" entails.  In its description of "current conditions," the FEIS recognizes that the "fire suppression era" has resulted in an increase of natural fuel buildup on the forest floor, projects that "fuels treatment (for purposes such as reduction of natural fuels, improvement of range and wildlife habitat and enhancement of fire-dependent plant species) is expected to increase" and "must be completed in order to avoid large, uncontrollable fires," and describes common fuels management practices as including not only prescribed burning, but also crushing, grinding, slashing, and physical removal.  (A.R. 0321).  It recognizes that air quality considerations may reduce the number of acres treated through prescribed fire, resulting in more costly alternative treatment methods being used.  (Id.).  In its analysis of the environmental consequences, the Rogue River LRMP again describes fuel treatment methods as including but not limited to prescribed burning.  (A.R. 514-516).

The court accepts the Forest Service's position at oral argument that MS-25's provision requiring that fuels "will be managed to meet the intent of the objectives of the [RNA]" requires

the Forest Service to take steps to preserve the conditions which led to the establishment of the

RNA in the first place and, if necessary, to take steps to restore those conditions. (*See* A.R. 0259

(requiring the Forest Service to monitor research natural areas for "disturbance and continuing

cell quality")). This does not give the Forest Service carte blanche to authorize tree removal

from within a research natural area; instead, it imposes a duty on the Forest Service to manage

the fuels within the RNA in a manner that ensures that the conditions which led to the

establishment of the RNA are preserved. The sole remaining issue is whether such a fuels

management project may incidentally involve an economic element without being transformed

from a fuels management project to a prohibited "timber harvest."

### e. Incidental economic component is insufficient to transform "fuel treatment method" to a "timber harvest"

The Forest Service argues a fuel treatment project that only incidentally involves a

commercial sale or consumption element does not constitute a prohibited "timber harvest." The

court agrees.

The AFR Project proposes thinning treatments for the purpose of reducing hazardous

fuels. The Rogue River LRMP addresses thinning[39] as a vegetation management practice only

in passing, describing it as a "timber stand improvement" activity. Though not defined in the

Rogue River LRMP itself, the accompanying FEIS defines "timber stand improvement" as

"[m]easures such as thinning, pruning, release cutting[1], prescribed fire, girding, weeding or

poisoning of unwanted trees aimed at improving growing conditions for the remaining trees."

(A.R. 0618). The FEIS further distinguishes between "commercial thinning," defined to mean

"[a]ny type of thinning of timberstands which produce[s] merchantable material at least equal to

the value of the direct costs of timber harvesting," (A.R. 0602), and "precommercial thinning,"

---

[39] The Rogue River LRMP's FEIS defines "thinning" as "[a] silviculture treatment to reduce tree numbers and to maintain or accelerate the growth of the remaining trees." (A.R. 0617).

which is defined to mean "[t]he practice of removing trees of less than merchantable size from a stand so that the remaining trees will grow faster," (A.R. 0612). Standing alone, these definitions suggest that a thinning project involving the removal of merchantable trees which yield an economic return involves a "timber harvest," whereas a thinning project that involves the removal of sub-merchantable trees does not. However, as employed in the Rogue River LRMP, the term "timber stand improvement" or TSI refers to activities related to the management of timber as a crop, stating that "timber-stand improvement activities are scheduled for most acres that are to be intensively managed," (A.R. 1325); that thinning is a TSI activity that is "expected to enhance seedling survival or accelerate growth on a prescribed number of selected crop trees," (A.R. 1324); and that "[a]nnual levels of thinning may vary to take advantage of market conditions," (A.R. 1325). Accordingly, "commercial thinning" is included under the heading "intermediate harvest" in the estimate of the average annual harvest for the first decade. (A.R. 1328-1329). Thus, the Rogue River LRMP's use of the term "commercial thinning" refers to the regularly programmed activities associated with growing and cultivating timber as a crop, not to treatments applied for the purpose of fuels management.

As described above, the term "timber harvest" does not mean "tree removal." Therefore, the Director of the Forest and Range Experiment Station has the authority to approve fuel treatments that require tree felling. Logically, the Director must also have the authority to authorize tree removal in order to prevent the felled trees from contributing to hazardous fuels buildup. In this case, the Forest Service has determined that the Pacific ponderosa pine— Douglas fir ecosystem that the Ashland RNA was established to protect has been "disturbed," not by "timber harvest," but by fire suppression, resulting in a general decline in the population of large ponderosa pine and Douglas-fir trees. (A.R. 7140). In other words, the ecosystem

which the Ashland RNA was established to protect is threatened. The Forest Service has determined that, in addition to pruning, non-commercial thinning, and prescribed burning, it may be necessary to remove a limited number of large trees in order to preserve the Ashland RNA's natural ecosystem. (A.R. 7831). The Forest Service has further determined that fuel loadings preclude the exclusive use of prescribed fire as the exclusive fuel treatment method. The Forest Service's decision falls within its expertise and is therefore entitled to deference. Hapner v. Tidwell, 621 F.3d 1239, 1244 (9th Cir. 2010).

The Forest Service argues that the environmental impacts of the proposed thinning treatments is the same regardless of whether the trees that must not only be cut but also removed are sold, traded for services, or simply piled and left to rot. That is, the design and scope of the project's thinning treatments is not affected by the commercial component because the focus of the project is fuels reduction, not profitability. *See* Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1247-48 (9th Cir. 2005) (in deciding NEPA claim, court held that forest plan's prohibition on "timber management," defined as "the purposeful growing, tending, harvesting, and regeneration of regulated crops of trees to be cut into logs, bolts, or other round sections for industrial or consumer use" did not prohibit timber harvest for the purpose of reducing fire risk). The Forest Service argues that it has reasonably interpreted the Rogue River LRMP as allowing the sale of trees that must be removed in order to avoid a waste of a valuable Forest resource. The court agrees.

Plaintiffs argue that interpreting the Forest Service's authority to treat fuels to include the authority to sell commercially viable trees removed through thinning projects to reduce hazardous fuels could open the door to the regular harvesting of the very trees the Ashland RNA was established to protect. The court is sympathetic to this concern. The Forest Service has

Page 68 – REPORT AND RECOMMENDATION

twice classified all of the ponderosa pine and Douglas-fir in the area encompassed by the

Ashland RNA as "old growth," first in the 1970 establishment report for the Ashland RNA,

(A.R. 0013), and again in the 1990 Rogue River LRMP FEIS, (A.R. 0272). The Rogue River

LRMP's FEIS describes the term "old growth" as generally meaning forest stands 206 years old

or older, although the term could be applied to other stands. (A.R. 0253). Historically, timber

harvest within the Forest "occurred primarily in old growth and mature forest stands," (A.R.

0258), with old growth harvest serving as "the backbone of the timber industry," (A.R. 0259).

When the Rogue River LRMP was issued, the Forest Service projected that the "majority of

timber-suited, existing old growth that is allocated to management areas with full yield strategies

will be harvested after the first two decades," (A.R. 0173), and that "[s]econd growth stands will

not be able to fill this role for the wood products industry for at least the next two decades,"

(A.R. 0259).  Of the 98,617 acres of old-growth in the Forest at the time the Rogue River LRMP

was issued, 59,031 acres was allocated to Management Areas with no programmed timber

harvest.  (A.R. 1312).  Accordingly, the Forest Service characterized the Forest "as a 'deficit'

inventory Forest when examining the scheduling of potential timber harvest."  (A.R. 1324).

Plaintiffs no doubt envision an old-growth starved timber products industry salivating at

the prospect of harvesting Ashland RNA's old growth forest.  In these times of lean economic

conditions and tight federal budgets, the fear that the Forest Service might be tempted to cash in

on the Ashland RNA's untapped old growth resource is not unfounded.  The reality is that

designing a stewardship contract or timber sale contract to include commercially valuable timber

makes the contract more valuable and will generate higher bids.  *See* Sierra Forest Legacy v.

Rey, 526 F.3d 1228, 1231-32 (9th Cir. 2008) (Forest Service acknowledged that "the size of tree

made available for harvest has a significant influence on sale volume per acre averages and thus

per unit bid values," therefore "including only a few medium-sized trees[40] can make an impact on the economic viability of a given project"), *withdrawn and superseded*, 577 F.3d 1015 (9th Cir. 2009); Sierra Nevada Forest Prot. Campaign v. Tippin, No. CIVS06-00351 FCDDAD, 2006 WL 2583036, at *8 (E.D. Cal. Sept. 6, 2006) (Forest Service argued that imposing 12-inch DBH or 20-inch DBH diameter limit restrictions would make implementing hazardous fuels reduction project in a cost effective manner "difficult"). The fact that the Forest Service has carefully avoided analyzing the commercial value of the trees that will be removed as the result of the AFR Project's thinning treatments does not change this fact.

However, the record in this case demonstrates a longstanding effort by the Forest Service to collaborate with the local community and respond to conservationist concerns while performing its duty to protect and preserve the Ashland RNA. The treatment strategy, while extensive, proposes to cure the changing conditions within the Ashland RNA caused by decades of human intervention in the form of fire suppression. The AFR Project does not propose to let the timber products industry loose within the Ashland RNA. The AFR Project identifies the preservation of "legacy" trees as a treatment element common to all of the action alternatives. (A.R. 6912). "Legacy trees" are described as:

> typically pine species or Douglas-fir over 150 years old (which may be determined by coring), or trees with a detectable fire scars [sic] with a diameter that is at least twice that of the average diameter for the stand surrounding it. Legacy trees can also include hardwoods and other species where these species are remnants of a previous stand.

(A.R. 6913). The Preferred Alternative's treatment prescriptions, set out in Appendix D to the FEIS, sets out measurable prescriptions for the relative density to be achieved and explicitly

---

[40] Sierra Forest Legacy v. Rey involved a dispute regarding the Forest Service's attempt to amend the Sierra Nevada Forest Plan. The Forest Service completed a supplemental EIS as part of that initiative, in which it calculated that, assuming average heights, each 12-inch DBH tree would yield 39 board feet, each 20-inch DBH tree would yield 317 board feet, and each 24 inch DBH tree would yield 710 board feet.

provides that Douglas-fir trees with a live crown ration of greater than 40% which may be a part of "Cohort 1" are to be retained. (A.R. 7411-7416). A "cohort" is identified as a stand structure, with "Cohort 1" described as an "older, mature cohort" consisting of trees "[g]enerally 25 to 50+ inches DBH, 150 to 300+ years." (A.R. 7400). The Preferred Alternative not only provides that the largest trees are to be reserved first, it provides that the "[t]rees identified for thinning would be used to satisfy snag and down wood targets (largest first)." (A.R. 6970). The Forest Service further proposes to identify and validate the actual on-the-ground conditions designed to trigger these thinning treatments concurrent with implementation. (A.R. 6968). All of these design elements appear to be carefully tailored to achieve a restoration of the RNA, not a mining of its old-growth resources.

This community has multiple long standing, vested interests in the management of the Forest in general and the Ashland RNA in particular. The court respects and commends the long and good faith close collaboration between the Forest Service, community, environmental organizations and advocates, academics and others on the AFR Project. The court believes these efforts were in large part motivated by a shared desire to preserve valuable environmental resources for present and future generations. The court expects this close collaboration to continue to the completion of the AFP Project. Although honest disagreements and divergent opinions will surely continue with these type of projects, the AFR Project should serve as an example of how the involved parties can work through these disputes in a productive manner for the benefit of the community. The court also respects Navickas' and Linninger's sincere and passionate efforts to protect environmental resources that are important to them and the community. There can be no doubt that the community that has actively participated in the design of this project will be watching carefully as the project is implemented. If for some

reason the Forest Service fails to implement the AFR Project in a manner that is consistent with the projects stated purpose and its treatment prescriptions, the court fully anticipates that there will be a public outcry and legal action, and the court's doors will be open to those plaintiffs. However, the court does not anticipate the need for any further legal proceedings, as the record before the court clearly demonstrates a commendable and ongoing effort by the Forest Service to manage the Forest in a transparent manner consistent with the public's interest and community values.

In sum, for the reasons stated above and under the specific facts of this case, the court finds that the Forest Service's determination that the Forest Director had the authority to approve tree removal within the Ashland RNA for the purpose of reducing hazardous fuels was not arbitrary and capricious.

## Conclusion

For the reasons stated above, the AFR Project complies with the Rogue River LRMP's standards and guidelines for research natural areas, MS-25. The Forest Service is therefore entitled to summary judgment on plaintiffs' third claim for relief.

## D. Late Successional Reserves

As Count IV, plaintiffs allege the Forest Service violated NFMA by designing the AFR Project in a manner that fails to comply with the NW Forest Plan's standards and guidelines for the Late Successional Reserves. Plaintiffs have abandoned this claim. (Pls' Mem. Supp. Mot. Summ. J., Dckt. # 47, pp. 1 n.1). Therefore, summary judgment should be entered in favor of the Forest Service on plaintiffs' fourth claim for relief.

//

//

## II. HFRA claims

Counts V and VI of the Complaint allege violations of the Healthy Forest Restoration Act. HFRA was enacted to "reduce wildfire risk to communities, municipal water supplies, and other at-risk Federal land," "enhance efforts to protect watersheds and address threats to forest and rangeland health, including catastrophic wildfire," and "protect, restore, and enhance forest system components to promote the recovery of threatened and endangered species, to improve biological diversity, and to enhance productivity and carbon sequestration." 16 U.S.C. § 6501(1), (3), (5). The HFRA requires the Forest Service to implement "[a]s soon as practicable" an "authorized hazardous fuel reduction project" on federal land "in wildland-urban interface areas," certain defined classes of federal land proximate to municipal water supply systems or tributaries thereof, and all federal land not otherwise included that contains habitat for threatened and endangered species, provided that certain conditions are satisfied. 16 U.S.C. § 6512(a)(1)-(3), (5).

### A. Authorized hazardous fuel reduction project

As Count V, plaintiffs allege the AFR Project does not meet HFRA's definition of an "authorized hazardous fuel reduction project" because it fails to comply with the standards and guidelines established by the Rogue River LRMP and the NW Forest Plan.

#### 1. Administrative Exhaustion

As a threshold matter, the Forest Service argues that plaintiffs have failed to exhaust this claim because they did not identify any HFRA violations during the administrative review process. (Defs' Mem. Supp. Cross-Mot. Summ. J., Dckt. # 54, pp. 31-32). Plaintiffs argue they sufficiently alleged a HFRA violation by arguing that the AFR Project would violate the Rogue

River LRMP and the NW Forest Plan, because it is the AFR Project's failure to comply with these standards and guidelines that violates HFRA.

The APA "requires that plaintiffs exhaust available administrative remedies before bringing their grievances to federal court." Idaho Sporting Congress, 305 F.3d at 965. Where, as here, a plaintiff challenges an authorized hazardous fuel reduction project, HFRA and its implementing regulations generally prohibit[41] the court from considering any "issue" not raised in the administrative review process. 16 U.S.C. § 6515(c)(2); 36 C.F.R. § 218.14. The purpose of the exhaustion requirement "is to avoid premature claims and to ensure that the agency possessed of the most expertise in an area be given first shot at resolving a claimant's difficulties." Idaho Sporting Congress, 305 F.3d at 965 (citing Saulsbury Orchards & Almond Processing, Inc. v. Yeutter, 917 F.2d 1190, 1195 (9th Cir. 1990)). "[T]here is no bright-line standard as to when this requirement has been met," therefore the court "must consider exhaustion arguments on a case-by-case basis." Id.

A detailed and comprehensive overview on Ninth Circuit jurisprudence on issue exhaustion is found in a recent opinion by Magistrate Judge Papak of this District. Or. Natural Desert Ass'n v. McDaniel, 751 F.Supp.2d 1151, 1157-1162 (D. Or. 2011). The court finds Judge Papak's analysis and reasoning to be thorough and sound, and adopts the principles he has distilled from Ninth Circuit case law. In the Ninth Circuit, issue exhaustion does not require that the plaintiff to "cite the relevant statute or regulation" in his administrative appeal. Id. at 1161 (citing Idaho Sporting Congress, 305 F.3d at 965-66; Native Ecosystems Council v. Dombeck, 304 F.3d 886, 900 (9th Cir. 2002), modified on other grounds, 535 F.3d 1058 (9th Cir. 2008)). The plaintiff is not required to "invoke the exact legal terms of art drawn from those statutory

---

[41] The regulations provide an exception "in exceptional circumstances such as where significant new information bearing on a specific claim only becomes available after conclusion of the administrative review." 36 C.F.R. § 218.14.

authorities." Id. (*citing* Idaho Sporting Congress, 305 F.3d at 966; Nat'l Parks & Conservation Ass'n v. BLM, 606 F.3d 1058, 1066 (9th Cir. 2010)). The agency's decision need not actually address the plaintiff's issue, although, if it does, this confirms that the plaintiff placed the agency on notice of that issue. Id. (*comparing* Native Ecosystems Council, 304 F.3d at 899 (agency addressed issue) *with* Nat'l Parks & Conservation Ass'n, 606 F.3d at 1066 (issue exhausted even though IBLA did not address it)). The plaintiff can exhaust an issue by either articulating the specific reason why the agency's action is improper on appeal, id. (*citing* Nat'l Parks & Conservation Ass'n, 606 F.3d at 1066), or by "making a 'general objection' under a statute to an agency action without referencing any specific violations of that statute," id. (*citing* Lands Council, 629 F.3d at 1075–76; Native Ecosystems Council, 304 F.3d at 899). However, the plaintiff "cannot exhaust an issue merely by making 'general comments' about an environmental feature completely attenuated from the legal authority protecting that feature." Id. (*citing* Great Basin Mine Watch v. Hankins, 456 F.3d 955, 967 (9th Cir. 2006)). "Nor does a plaintiff exhaust an issue when it later employs an entirely different and altogether new argument before the district court." Id. (*citing* Buckingham v. Sec'y of the USDA, 603 F.3d 1073, 1080–81 (9th Cir. 2010)).

In this case, the Forest Service concedes that it has had the opportunity to determine whether or not the AFR Project complies with the Rogue River LRMP and the NW Forest Plan, but argues it has not had the opportunity to consider whether non-compliance with these forest plans violates HFRA. The Forest Service is wrong. In his comments responding to the DEIS, Lininger argues that the NW Forest Plan's ACS requires that LHZ 1 and LHZ 2 areas be managed as riparian reserves, objects to the extent and scope of the proposed tree removal, and argues that the DEIS misstates HFRA as stating that the Forest Service is "not required" to

develop a no-action alternative when in fact HFRA requires that the agency study, develop, and describe "the alternative of no action." (Supp. A.R. 3507). Lininger renewed these arguments in his comments responding to the AFR Project's FEIS, and specifically objected that the AFR Project failed to comply with the Rogue River LRMP's standards and guidelines for soils and for the Ashland RNA, (A.R. 7709-7713, 7730-7733), as well as the NW Forest plan's ACS and standards for late successional reserves, (A.R. 7714-7720). In arguing that the AFR Project fails to comply with the Rogue River LRMP's standards and guidelines for soils, Lininger specifically objected that "HFRA also requires authorized hazardous fuel reduction projects to be consistent with forest plans," citing 16 U.S.C. § 6512(b). (A.R. 7713). The court therefore finds that plaintiffs have administratively exhausted the issue of whether failure to comply with the standards and guidelines established by the Rogue River LRMP and NW Forest Plan would violate HFRA.

## 2. Merits

The Forest Service argues that even if plaintiffs are found to have exhausted their HFRA claims, those claims are entirely derivative of an alleged NFMA violation for which the APA provides an adequate remedy, therefore summary judgment should be entered in favor of the Forest Service.

HFRA provides that an "authorized hazardous fuel reduction project shall be conducted consistent with the resource management plan and other relevant administrative policies or decisions applicable to the Federal land covered by the project." 16 U.S.C. § 6512(b). HFRA defines "resource management plan" to mean, in relevant part, "a land and resource management plan prepared for 1 or more units of land of the National Forest System described in section 6502(1)(A) of this title under section 1604 of this title." 16 U.S.C. § 6511(13)(A). In other

words, where the Forest Service has developed and implemented a resource management plan as NFMA requires, 16 U.S.C. § 1604, a hazardous fuel reduction project authorized pursuant to HFRA must be "conducted consistent with" that resource management plan.

The Forest Service argues that failure to comply with a forest plan issued pursuant to NFMA constitutes an original violation under NFMA, and any HFRA violation that results is secondary or derivative of the NFMA violation and thus not independently actionable. Although plaintiffs argue that the AFR Project violates HFRA in their motion for summary judgment, (Pls' Mem. Supp. Mot. Summ. J., Dckt. # 47, pp. 23), they fail to respond to the arguments made by the Forest Service in its cross motion for summary judgment. Thus, it appears to the court that plaintiffs have abandoned this HFRA claim. Summary judgment is properly entered against a party who fails to offer any argument or evidence in opposition to an opposing party's motion, as this failure constitutes abandonment of the party's claims. *See* Deirmenjian v. Deutsche Bank, A.G., No. CV 06-00774 MMM (CWx), 2010 WL 3034060, at \* 7 (C.D. Cal. July 30, 2010) (collecting cases). The court has conducted a thorough and extensive search of cases both within the Ninth Circuit and across the nation, and has not found a single case which addresses whether HFRA requires substantive compliance with a LRMP. The court agrees with the Forest Service that, even if substantive compliance with an LRMP is independently required under HFRA, a plaintiff has an adequate remedy under the APA for the resulting NFMA violation.

Because plaintiffs have apparently abandoned this HFRA claim and the remedy they seek is available to them under their NFMA claims, summary judgment should be entered in favor of the Forest Service on plaintiffs' fifth claim for relief.

//

//

### B. Failure to Maintain Old-Growth

As Count VI, plaintiffs allege the Forest Service violated HFRA by designing the AFR
Project in a manner that is not designed to maintain or restore old-growth conditions,
specifically, by allowing the harvest of old growth trees without first establishing the pre-fire
suppression old growth conditions characteristic of the Forest. Plaintiffs have abandoned this
claim. (Pls' Mem. Supp. Mot. Summ. J., Dckt. # 47, pp. 1 n.1). Therefore, summary judgment
should be entered in favor of the Forest Service on plaintiffs' sixth claim for relief.

### III. NEPA claims

Counts VII and VIII of the Complaint allege violations of the National Environmental
Policy Act. NEPA serves two fundamental purposes: (1) to require agency consideration of
detailed information concerning significant environmental impacts; and (2) to ensure that the
public can both access and contribute to that body of information via comments. San Luis
Obispo Mothers for Peace v. Nuclear Regulatory Comm'n, 449 F.3d 1016, 1034 (9th Cir. 2006)
(*citing* Dep't of Trans. v. Public Citizen, 541 U.S. 752, 768, 124 S.Ct. 2204 (2004)). NEPA is
strictly a procedural statute designed to ensure that federal agencies will take a "hard look" at the
environmental consequences of any proposed agency action; it does not mandate substantive
results. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 23, 129 S.Ct. 365 (2008); Barnes,
655 F.3d at 1131 (internal citations omitted). Taking a "hard look" at environmental
consequences of major federal actions includes "considering all foreseeable direct and indirect
impacts. Furthermore, a 'hard look' should involve a discussion of adverse impacts that does not
improperly minimize negative side effects." N. Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969,
975 (9th Cir. 2006) (internal quotation marks and citations omitted); *see also* Or. Natural Res.
Council Fund v. Brong, 492 F.3d 1120, 1133 (9th Cir. 2007) ("[G]eneral statements about

possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided.") (internal quotation marks omitted). In assessing the adequacy of an agency's EIS, courts apply the "rule of reason" standard which determines whether the EIS contains a "reasonably thorough discussion" of the "probable environmental consequences." Pac. Rivers Council v. U.S. Forest Serv., --- F.3d ---, ---, 2012 WL 2333558, at *6 (9th Cir. 2012) (*quoting* Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1071 (9th Cir. 2002)).

## A. Hard Look

As Count VII, plaintiffs allege the Forest Service violated NEPA by failing to take a hard look at the environmental consequences of implementing the AFR Project. Specifically, plaintiffs allege the Forest Service failed to disclose the direct, indirect or cumulative effects to soil productivity, slope stability, late-successional forest, the northern spotted owl and its habitat, water quality, Riparian Reserves, the Pacific fisher and its habitat, dispersed recreation, and "emergency fire suppression operations." However, on summary judgment, plaintiffs do not argue that the Forest Service failed to analyze an important component of any of these nine issues such that the omission renders the Forest Service's analysis arbitrary and capricious. Instead, they argue the final EIS is not sufficiently site-specific[42] because the Forest Service has opted to rely on satellite imagery for the purpose of planning and developing the AFR Project

---

[42] The Forest Service initially argued that Lininger's claim lacks merit because the AFR Project's final EIS is site-specific, not programmatic. *See* Pac. Rivers Council v. U.S. Forest Serv., --- F.3d ---, ---, 2012 WL 2333558, at *12 (9th Cir. 2012) (stating that the level of analysis required in an EIS "is different for programmatic and site-specific plans"). In the context of national forest management, the programmatic stage consists of the development and implementation of a land resource management plan. 'Ilio'ulaokalani Coalition v. Rumsfeld, 464 F.3d 1083, 1094 (9th Cir. 2006). Accordingly, the Rogue River LRMP and its accompanying final EIS are programmatic. (A.R. 1798). While Lininger disputes the Forest Service's assertion that the AFR Project complies with the Rogue River LRMP, he agrees that the AFR Project's final EIS is not programmatic. (Pls' Reply Supp. Mot. Summ. J., Dckt. # 61, pp. 24).

rather than performing on-the-ground surveys and inventories to validate the conditions within the project area. By designing the AFR Project such that on-the-ground conditions are validated concurrently with project implementation by on-the-ground personnel who then individually determine the extent of the treatments to be applied, plaintiffs argue the Forest Service has "violated NEPA by preparing a project-specific EIS that fails to define the project, thereby evading any meaningful analysis of what the project's actual impacts will be." (Pls' Reply Supp. Mot. Summ. J., Dckt. # 61, pp. 26). In other words, plaintiffs argue that under NEPA, a showing of forest-wide and project-specific inventories is a condition precedent to the approval of any project.

## 1. NEPA does not require the Forest Service to field-validate its planning data

Plaintiffs first argue that the AFR Project's final EIS is not sufficiently site-specific because the Forest Service did not validate its planning data through on-the-ground inventories.

A site-specific EIS "is required at the point when a federal agency makes an 'irreversible and irretrievable commitment of the availability of resources.'" Friends of the Se. Future v. Morrison, 153 F.3d 1059, 1063 (9th Cir. 1998) (internal citations omitted); Conner v. Burford, 848 F.2d 1441, 1447-48 (9th Cir. 1988) (site-specific EIS is required at the "go/no go point of commitment"). A site-specific EIS must include "data-gathering and analysis of system-wide impacts." See Friends of Yosemite Valley v. Norton, 348 F.3d 789, 801 (9th Cir. 2003) (National Park Service did not violate NEPA by declining to perform data-gathering and analysis of system-wide impacts at programmatic EIS stage); California v. Block, 690 F.2d 753, 761 (9th Cir. 1982) (explaining that considerations regarding the adequacy of a programmatic EIS may differ from those for a site-specific EIS).

To comply with NEPA's "hard look" mandate, courts have held that agencies are obligated to maintain a current inventory of resources so that an adequate baseline exists to evaluate the environmental impacts of a proposed action. Ctr. for Biol. Diversity v. Bureau of Land Mgmt., 422 F.Supp.2d 1115, 1163 (N.D. Cal. 2006); *see also* Or. Natural Desert Ass'n v. Rasmussen, 451 F.Supp.2d. 1202, 1212-13 (D. Or. 2006). The environmental baseline is an integral part of an EIS, because it is against this information that environmental impacts are measured and evaluated; therefore, it is critical that the baseline be accurate and complete. Am. Rivers v. Fed. Energy Regulatory Comm'n, 201 F.3d 1186, 1195 & n. 15 (9th Cir. 2000); Ctr. for Biol. Diversity, 422 F.Supp.2d at 1163. However, NEPA does not specify the "quantum of information" an agency must possess about any resource before the agency may proceed with a given project, and the information available to an agency can always be augmented. Alaska v. Andrus, 580 F.2d 465, 473 (D.C. Cir. 1978), *vacated in part on other grounds*, Western Oil & Gas Ass'n v. Alaska, 439 U.S. 922, 99 S.Ct. 303 (1978).

In this case, the Forest Service planned and designed the AFR Project at the project area or landscape scale. (A.R. 7006). The Forest Service used satellite imagery as the "best available" data for the purposes of planning the AFR Project. (A.R. 6905-6906). This data is assumed to have an accuracy of 80% or greater, therefore, the Forest Service noted that "an overriding assumption for each Action Alternative is that actions would be performed only after field verification of specific treatment criteria." (A.R. 6906). The Forest Service also drew on data specific to certain resources that "has been inventoried and ground validated" in conjunction with other management activities. (A.R. 6906-6907).

Plaintiffs argue the Forest Service has violated NEPA by failing to verify the accuracy of the satellite imagery data through traditional ground based inventories prior to proposing and

approving the AFR Project. However, plaintiffs have not cited any authority suggesting that a federal agency must perform on the ground analysis in order to satisfy NEPA's "hard look" requirement. Neither NEPA nor its implementing regulations explicitly require that an agency inventory the environmental characteristics on the affected land for each proposed action; that requirement, if indeed there is one, is implicit in NEPA's "hard look" requirement. The court notes that the Ninth Circuit has rejected the argument that a federal agency must demonstrate compliance with a forest LRMP through on-the-ground analysis. Lands Council v. McNair, 537 F.3d 981, 991-94 (9th Cir. 2008) (en banc) (internal quotation marks omitted), *overruled on other grounds by* Winter v. Natural Res. Def. Council, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). If on-the-ground analysis is not required to demonstrate actual compliance with the substantive requirements of NFMA, it is difficult to conceive that on-the-ground analysis could be required to demonstrate compliance with NEPA's procedural requirements.

Absent any authority indicating that such validation is required, the court declines to find that the Forest Service's decision to defer on-the-ground validation of its project planning data violates NEPA's "hard look" requirement or is otherwise arbitrary and capricious.

### 2. NEPA does not require the Forest Service to describe and analyze every implementing action of the AFR Project

Plaintiffs next argue that the AFR Project's final EIS is not sufficiently site-specific because it does not disclose the "location, spatial arrangement, timing, [or] intensity of the proposed vegetation treatments and connected actions." Absent such disclosure, plaintiffs argue the Forest Service cannot have undertaken any meaningful environmental analysis.

First, NEPA does not require that every implementing action of a proposed project be set forth and analyzed in detail, even in a site-specific EIS. Envtl. Def. Fund, Inc. v. Andrus, 619 F.2d 1368, 1376 (10th Cir. 1980) (*citing* Vt. Yankee Nuclear Power Corp. v. Natural Res. Def.

Council, Inc., 435 U.S. 519, 551-555, 98 S.Ct. 1197 (1978)). Such a reading would directly conflict with the admonitions of NEPA's implementing regulations, which require that "[e]nvironmental impact statements shall be kept concise and shall be no longer than absolutely necessary to comply with NEPA and with these regulations." 40 C.F.R. § 1502.2(c); *see also* 40 C.F.R. § 1502.7 (suggesting maximum page limits for an EIS).

Second, the final EIS and its attachments contain much of the detail which plaintiffs assert is missing. While the AFR Project's final EIS does not narratively describe the location of the proposed treatments, it does include a map which shows where the proposed treatments will be applied. (A.R. 6967). It includes a map of the Preferred Alternative's four "Strategic Categories," (A.R. 6960), and identifies the total number of acres in each "Strategic Category," (A.R. 6966). Because the final EIS organizes the treatment strategies according to Plant Association Groups ("PAGs"), (*see* A.R. 6874, 6904), it describes the treatments within each "Strategic Category" using to the number of acres to be treated according to PAG, (A.R. 6966). The PAG treatments' prescriptions are described in detail in Appendix D. (A.R. 7400-7417). Notably, the density management treatments are designed to be implemented in a staggered or staged fashion, in order to "allow time for root development (wind firmness) in residual trees and to minimize 'shock' related responses that reduce tree or stand vigor." (A.R. 7402). Likewise, the thinning treatments "would be done in stages to slowly release stands from the excessive densities that have existed for many years, and to minimize detrimental effects on soil productivity." (Id.). The final EIS describes the period of time over which the treatments will be applied, (see A.R. 6908 (stating that all of the action alternatives assume a ten year project implementation period)), the order in which the four "Strategic Categories" will be treated and the estimated time it will take to complete the treatments, (A.R. 7021-7022).

On this record, the court cannot conclude that the Forest Service has failed to identify where the proposed treatments will be applied, thereby precluding a meaningful analysis of the environmental impacts associated with project implementation.

### 3. The Forest Service did not act arbitrarily or capriciously in its choice of analysis scale

To the extent that plaintiffs argue the Forest Service cannot have undertaken any meaningful environmental analysis without describing in granular detail where the proposed treatments will be applied, they object to the scale at which the Forest Service has performed its analysis, not the adequacy of the EIS.

"Agencies have 'discretion to determine the physical scope used for measuring environmental impacts' so long as they do not act arbitrarily and their 'choice of analysis scale ... represent[s] a reasoned decision.'" Wildwest Inst. v. Bull, 547 F.3d 1162, 1173 (9th Cir. 2008) (*quoting* Idaho Sporting Congress, 305 F.3d at 973). In this case, the Forest Service performed its effects analysis at the sub-watershed or "6th field" scale. (A.R. 7006 ("For potential effects to be measurable (especially cumulative effects), the sub-watershed scale was selected for analysis.")). While the AFR Project is located entirely within the Bear Creek Watershed, its project area lies within four sub-watersheds: the Ashland Creek sub-watershed, the Neil Creek sub-watershed, the Upper Wagner Creek sub-watershed, and the Hamilton Creek sub-watershed. (A.R. 7006-7007). The Forest Service's decision to analyze the environmental impacts of the AFR Project at the sub-watershed scale is consistent with Lininger's observation during the administrative process that the Bear Watershed is "a heterogeneous environment . . . where topography, soil moisture and disturbance history can influence substantial variation of forest structure even among similar vegetation types." (Supp. A.R. 3488).

Plaintiffs have failed to identify any part of the record which would require the Forest Service to perform its analysis on a more granular scale than the sub-watershed scale. *See* Idaho Sporting Congress, 305 F.3d at 973-974 (where agency's own scientists concluded that the habitat needs of certain management indicator species "must be addressed at a landscape scale," the agency acted arbitrarily and capriciously by selecting a smaller "home range" scale for its cumulative effects analysis); Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv., 265 F.3d 1028, 1037-38 (9th Cir. 2001) (agency acted arbitrarily and capriciously by ignoring its own expert advice where no contrary recommendations existed in the record); Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856 (1983) (agency action is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem"). Therefore, the court cannot conclude that the Forest Service's choice of analysis scale is arbitrary and capricious.

### 4. Conclusion

In sum, and for the reasons stated above, the court recommends that summary judgment be entered in favor of the Forest Service on plaintiffs' seventh claim for relief.

### B. Purpose and Need

As Count VIII, plaintiffs allege the Forest Service violated NEPA by designing the AFR Project in a manner that does not meet the project's stated purpose and need. Plaintiffs have abandoned this claim. (Pls' Mem. Supp. Mot. Summ. J., Dckt. # 47, pp. 1 n.1). Therefore, summary judgment should be entered in favor of the Forest Service on plaintiffs' eighth claim.

## RECOMMENDATION

For the reasons stated above, plaintiffs' motion for summary judgment (#42) should be GRANTED as to Count I but otherwise denied, plaintiffs' motion to strike (#64) should be

granted as to Exhibit B and DENIED as to Exhibit A; and defendants' cross motion for summary judgment (#53) should be DENIED as to Count I and GRANTED as to Counts II, III, IV, V, VI, VII and VIII.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.* Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. *Objections to this Report and Recommendation, if any, are due by September 25, 2012. If objections are filed, any response to the objections is due by October 12, 2012. See* FED. R. CIV. P. 72, 6.

DATED this _____ day of September, 2012.

MARK D. CLARKE
United States Magistrate Judge